[No. 11781.    Department One.    July 23, 1914.]

KANASKAT LUMBER & SHINGLE COMPANY, *Appellant*, v. CASCADE TIMBER COMPANY et al., *Respondents.*[1]

SALES—CONTRACTS—CONSTRUCTION. A contract whereby one party agrees to furnish the other all the cedar logs cut by it in a specified township upon lands now owned or hereafter purchased, as such cedar logs are reached by it in its logging operations, and to deliver the logs cut to the second party at its shingle mill to be erected and located adjacent to the first party's railroad track, and the second party agrees to purchase of the first party all the cedar logs cut by it from said township as cut and delivered at said mill, and pay for same at the rate of $5.50 per thousand feet B. M., but the price to be adjusted from time to time according to the Tacoma market, and to be at all times $1.50 per thousand feet B. M., less than the Tacoma market price, the agreement to be in force for a period of ten years from its date, constitutes a mutual contract of sale.

SAME—CONSTRUCTION BY PARTIES. Under such a contract, where the logs supplied varied from year to year in amount, and the delivery, whether greater or less, was accepted without question, the fact that the second party erected a shingle mill for the purpose of manufacturing the logs, and that both parties had mutually performed their agreements for a period of six years, could not be construed as a construction of the contract by the parties to the effect that the first party was bound to keep the second party's mill in operation for the period named in the contract.

[1]Reported in 142 Pac. 15.

Appeal from a judgment of the superior court for Pierce county, Easterday, J., entered December 6, 1913, dismissing an action on contract, upon sustaining a demurrer to the complaint.  Affirmed.

*Hughes, McMicken, Dovell & Ramsey*, for appellant.

*Hayden, Langhorne & Metzger*, for respondents.

CHADWICK, J.—This action was brought by plaintiff, as assignee of one Charles E. Hill, to recover damages for failure to deliver cedar logs under a contract, the material parts of which follow:

"Whereas Charles E. Hill of Tacoma, is about to erect a shingle mill adjacent to the tracks of the railroad owned by the Cascade Timber Company, Now Therefore, it is agreed by and between the Cascade Timber Company, a corporation, party of the first part, and said Charles E. Hill, party of the second part, as follows, to wit: The party of the first part agrees to furnish to the party of the second part all the cedar logs cut by it from township twenty-two (22) North Range eight (8) East, W. M., in King county, whether upon lands now owned by it or hereafter purchased by it, and further agrees to cut cedar logs as they are reached in the logging operations of the party of the first part in said township and to deliver the logs cut to the party of the second part on board cars at said shingle mill, which mill is to be located adjacent to the railroad track of the first party. Said first party further agrees to deliver to the second party without cost or expense to him, the cars furnished by the Northern Pacific Railway Company at the connection of said first party's track with the said Northern Pacific Railway Company's track near Kangley in King county, for the use of the said Charles E. Hill or his assigns and further agrees to haul without charge the cars loaded by the said Charles E. Hill and assigns with shingles at said mill and to deliver the said cars to the Northern Pacific Railway Company at said connection.  The party of the second part agrees to purchase of the party of the first part all the cedar logs cut by the party of the first part from said township as such logs are cut and delivered on board cars at the said mill on the side track to be put in by the party of the first part and

agrees to unload the logs from the said cars promptly as the same are delivered. The party of the second part agrees to erect and keep said mill adjacent to the track of the first party. . . . It is agreed that the party of the second part shall pay to the party of the first part for said logs at the rate of $5.50 per thousand feet B. M. lawful money, but the price to be paid for said logs shall be adjusted from time to time according to the Tacoma market and that the price of logs delivered under this contract is to be at all times $1.50 per thousand feet B. M. less than the market price of logs of the same quality in the Tacoma market. The price herein named or at any time fixed is to govern until request for new adjustment shall be made by either party, such new adjustment to be made promptly upon such request and when made the price fixed is to govern from the date of such request unless otherwise agreed. . . .

"It is further agreed that this agreement shall be in force for a period of ten (10) years from the date hereof. It is further agreed that this agreement shall not be assigned by the party of the second part or by his assigns except by the consent in writing first had from the party of the first part, its successors or assigns.

"In witness whereof etc. (Signed) Cascade Timber Company, By John Bagley, Vice President, Attest: E. M. Hayden, Secretary. Charles E. Hill."

After once amending its complaint, plaintiff has appealed to this court from a judgment of dismissal, entered after a refusal to plead further. The business of the Cascade Timber Company was taken over by the Northern Coast Timber Company. We shall refer to the contracting parties as appellant and respondent.

The trial judge held that the contract did not require respondent to furnish appellant any certain amount of logs, or at any particular time, or for any period of time; that it did not contract to deliver or furnish appellant with all the cedar logs that might be necessary in its business; that its engagement under the contract was no more than a promise to deliver such cedar logs as it might cut while in pursuit of its own logging operations. Counsel agree that the ques-

tion is one of interpretation. Appellant takes the position that it is our duty, in defining the relative rights of the parties, to ascertain their intent, and when found to give effect to that intent; that the language employed is to be construed in the light of the facts and circumstances existing at the time of its execution and the objects and purposes the parties had in view. 2 Page, Contracts, § 1123; *Strong v. Eldridge*, 8 Wash. 595, 36 Pac. 696; *Graham v. McCoy*, 17 Wash. 63, 48 Pac. 780, 49 Pac. 235; *Parks v. Elmore*, 59 Wash. 584, 110 Pac. 381.

The duty of courts, when construing questioned contracts, to search out the intention of the parties, is well established, but that duty arises out of an ambiguity or omission that demands the reception of testimony to illustrate their intent, or to harmonize apparent conflicts. There is a presumption of finality which attends all written contracts and courts will not deliberately raise doubts or conjure ambiguities for the mere pleasure of construing them. *Fairbanks Steam Shovel Co. v. Holt & Jeffery*, 79 Wash. 361, 140 Pac. 394. Nor will the fact that a party has made a hard or improvident bargain warrant the court in binding the other party to terms raised by construction or implication.

These propositions are admitted as elementary by appellant; but it is said that the whole contract, when construed in the light of the facts and circumstances existing at the time the contract was made and the general object and purpose of the parties, demands a ruling that respondent was bound to keep appellant's mill in operation.

We need go no further than the contract. Its terms do not warrant us in holding that respondent is bound to deliver except as it conducts its own logging operations. A contract to so deliver on the one hand, and a contract to build a mill at a certain place and take the logs under such conditions as are stipulated in the contract, is not in contravention of any public policy, nor can we say, as a matter of law, that it involves a hardship and would not have been

entered into had appellant appreciated the force of the language employed. We would have the same right to imply into the contract an understanding that appellant was mindful of the fact that the business of logging is in a sense uncertain and subject to market fluctuations and that a logger would not bind himself to deliver excepting as he could operate at a profit, as we would have to imply that appellant would not have entered into the contract unless upon an understanding that respondent would keep it in material for the continuous operation of its mill. To so imply, would lead us into difficulties which could not be measured by any rule.

At the time the contract was entered into, appellant had no established business. It did not agree to build a mill of any certain capacity nor to take any particular amount of logs. The contract is one of sale. Respondent agreed to let appellant have the cedar as it was logged with other timber, at a certain price. There is nothing, unless we go outside of the written contract, to bring the parties within the rule announced in *Excelsior Wrapper Co. v. Messinger*, 116 Wis. 549, 93 N. W. 459, where the court found the contract to be ambiguous and applied the rule as it relates to an established . business having a certain demand for a certain amount of stock, which must have been known to the opposite party who was held to have contracted with reference thereto.

Counsel puts great reliance upon the words "the party of the second part agrees to *erect and keep said mill* adjacent to the track of the first party." They ask, why was appellant thus bound if respondent could log and deliver at will?

Respondent meets this argument, saying that it is no more than a stipulation to protect it from a call to deliver at some point away from its own tracks. Another answer might be that the words relied on are not to be singled out as the essence of the contract, but they are to be construed along with the agreement to deliver cedar logs "as they are reached in logging operations of the party of the first part."

We have discussed this phase of the case enough to demon-

strate that to receive testimony or to imply terms would but lead to confusion, whereas courts invite testimony to clear up ambiguous contracts and to make that certain which is uncertain.

Although questioned by counsel, we think the case of *Hamlyn & Co. v. Wood & Co.*, 2 Q. B. Div. (1891) 488, is in point. We agree with the observation by Lord Esher, M. R., that authorities are of little use in cases of this character, for at best they merely show that, in a particular case, an implication was or was not made. But that case more nearly touches this one than any that has been called to our attention by either party. Wood & Co., who were brewers, agreed to sell, and Hamlyn & Co., agreed to buy, all the "grains" (brewers' grains or spent malt mash) made by Wood & Co., at current rates for a period of ten years. Wood & Co., thereafter sold their business. The purchaser did not adopt the contract and suit was brought against Wood & Co., "for refusing to continue to perform the agreement, and to sell grains to the plaintiffs pursuant to the terms thereof." It was contended that

"it was an implied term of the agreement that the defendants would not by any voluntary act of their own prevent themselves from continuing the sale of grains under it for the period specified, and that the sale of their business was a breach of such implied term. . . ."

The judges held:

"The express contract is not that the defendants will sell the plaintiffs' grains for ten years; it is that the defendants will sell, and the plaintiffs will buy, all grains made by the defendants for ten years. What was the object of those parties as business men in entering into this agreement? The last stipulation of the contract shows that it was an advantage to the defendants to get the grains carried away from their brewery. Then what was the advantage which the plaintiffs as business men sought to gain? If the contract is construed against their contention, do they still gain something? It must be assumed that they must have thought that they would gain a profit by buying the grains at an agreed

price; and therefore it was an advantage to them to have the right of purchasing any grains the defendants might make in preference to any other purchaser for ten years. The agreement is not that they are to pay a sum down and then to have the grains for ten years, so that, if they did not get grains for ten years, they would not get what they had paid for. That would be a different case. In that case they would have paid money for nothing, unless the implication were made that the other party had stipulated that they would not voluntarily discontinue the business during ten years. The agreement is to pay a price to be ascertained from time to time, as provided by the contract, for the quantity of grains which they from time to time obtain. Therefore, it cannot be said that, unless the implication suggested is made, they will have paid money for nothing. Such being the terms of the contract, the question is whether we can say, looking at the contract in a reasonable and business way, that it is a necessary implication that both parties contemplated an undertaking by the defendants not voluntarily to discontinue the business for ten years, at whatever loss they might carry it on, or however advantageously they might be able to sell it. It seems to me that such an implication is tremendously strong, and one which is beyond all bounds. I cannot come to the conclusion that the defendants ever contemplated such a thing, or that the plaintiffs were entitled to suppose that they did so. . . . When parties have put into writing the terms upon which they agree, more especially in the case of mercantile contracts, it is a dangerous thing lightly to imply what they have not expressed. Here it is clear that there is no breach of the contract as expressed upon the face of the written document. The written contract only amounts to an engagement by the defendants to sell to the plaintiffs all grains made by them in their business as brewers for ten years, not for a sum paid down, but at the current price, to be ascertained from time to time as provided by the agreement. . . . In this case it seems to me very reasonable to conclude from the language used, and all the circumstances of the case, that all that either party intended was that, if the defendants should carry on business for ten years, they should sell their grains to the plaintiffs at the current prices to be ascertained as mentioned in the contract. It would

have been a different thing if the contract had been to pay so much down for a supply of grains for ten years. . . . Here, if we were to imply such a contract as is suggested, we should, as it seems to me, be incurring great danger of implying something that neither party ever intended. It is enough to say that I am not satisfied that either party intended that the defendants should be bound not to sell the business for ten years. On these grounds I think that the case is not brought within the principle upon which such implications are made; and we should not be justified in adding the term suggested to the written contract."

We find in the contract before us no ambiguities calling for a resort to implied terms or conditions. Undoubtedly conditions are implied in almost every contract, but they are only indulged where necessity compels. They are employed to support consequences that are natural and not to supply matters that are the proper subject of express contract. As, for instance, if no time for performance be stated, the law will usually imply a reasonable time; if stock be sold for breeding purposes, the law will imply that it is of proper age. We have no such case here. To invoke the doctrine, we would have to create an omission and supply a condition where we are not sure the minds of the parties met upon it or that they had in mind anything that does not fall within the letter of the contract.

"There is no allegation in defendants' answer that at the time they signed the contract in question they did not know what they were signing, or that they were not fully advised as to the terms and conditions of said contract. It is a well settled principle of law that all prior negotiations of the parties are merged into a contract in writing when one is entered into covering the subject-matter of such negotiations, and we are not aware of any rule which will authorize oral proof, as to representations made before the execution of such contract, to be introduced in evidence for the purpose of contradicting or enlarging the scope of such contract, without an allegation in the pleadings that such contract was in fact signed by the party making such allegations by mistake or fraud, or without full knowledge of the conditions

thereof.    As we have seen, such allegations were entirely
wanting in the case at bar and we think all representations
or negotiations prior to the execution of the contract were,
under the circumstances of this case, entirely immaterial, if
the contract in question was unambiguous." *Staver &
Walker v. Rogers,* 3 Wash. 603, 28 Pac. 906.

Nor do we find anything in the cases of *Sultan R. & Timber
Co. v. Great Northern R. Co.,* 58 Wash. 604, 109 Pac. 320,
1020 ; *Parks v. Elmore, supra; McCartney v. Glassford,* 1
Wash. 579, 20 Pac. 423, and *Graham v. McCoy, supra,*
that is contrary to our present holding.    Holding, as we do,
that there has been no breach, they have no application, un-
less it be the *Sultan R. & Timber Co.* case which admits the
rule to be as we have found it to be, and, if an authority at all,
is probably in favor of respondent, in that it holds a contract
somewhat similar not to be wanting in mutuality.

Appellant did not agree to take only such logs as respond-
ent *might* deliver.    Respondent bound itself to deliver *all*
the cedar logs cut in its logging operations, for which a fixed
price was to be paid.    The contract was mutual.    This
would not be doubted, we apprehend, if appellant were suing
for damages for failure or refusal to deliver logs that had
been cut and sold to some third party.

Finally, it is contended that the parties have put their
own construction upon the contract by mutual performance
for six years, and by the transfer of the contract and its ap-
proval by respondent and the agreement by appellant to
"continue to be responsible for the faithful performance of
said original contract, the same as if such assignment had
not been made."    This contention is obviously not sound.
The logs supplied from year to year varied in amount.    The
delivery, whether greater or less, was accepted without ques-
tion.    To say that the parties have construed the contract
to be as appellant insists, would lead to the inquiry whether
they are to recover as for the greatest amount delivered in
any one year, or the least amount, or an average of the

whole.   We would not know how to estimate or measure the damage, and no way has been pointed out to us.   It follows that the judgment of the lower court should be, and it is, affirmed.

CROW, C. J., MAIN, GOSE, and PARKER, JJ., concur.