[No. 14816.   Department Two.   September 30, 1918.]

CARNATION LUMBER & SHINGLE COMPANY, *Appellant,* v. TOLT LAND COMPANY *et al., Respondents.*[1]

VENDOR AND PURCHASER—OPTION CONTRACT—TITLE—APPROVAL BY MORTGAGEE—CONSTRUCTION. Where lumber and shingle mill property, mortgaged to a bank for $23,177.50, was leased at $300 per month, with option to purchase by warranty deed for $18,750 if taken within two years, or for $14,000 if taken in eighteen months, and the bank, which was a party to the negotiations, made indorsement on the contract that it "ratified, confirmed and approved" all of the terms of the agreement, rent being paid to the bank, the effect of the contract and indorsement was to charge the vendor and the bank with the burden of conveying by good and sufficient deed, free of the mortgage, if the option to purchase were exercised.

INSURANCE—OPTION CONTRACT—APPLICATION OF INSURANCE MONEY—SPECIFIC PERFORMANCE—EQUITY. In an action for the specific performance of a contract to convey property leased with option to purchase, insurance money paid on policies written in the names of all the parties interested must be applied as their interests may appear; and where a mortgagee had approved the contract and was with the vendor charged with the burden of conveying by good deed, free from the mortgage, the insurance money must be credited to the vendee upon the purchase price, where the option to purchase had been exercised; since equity takes no account of a change in form or character of property.

SAME. In such a case, the parties contracted against the rule that under a mere executory option, insurance money goes to the owner, where the contract provided that the purchaser should keep the property insured for at least $14,000 payable to the vendor as its interest may appear, and gave the purchaser the option to apply the proceeds of the policies to repairing or rebuilding.

VENDOR AND PURCHASER—TENDER. A tender of the sum due upon exercising an option to purchase leased land may demand that infirmities in the title disclosed by the abstract be cleared to comply with the vendor's contract to convey a good title.

VENDOR AND PURCHASER—LEASE AND OPTION CONTRACT—FORFEITURE—WAIVER. Acceptance of rent for a specified month, under a lease containing an option to purchase, is a waiver of any prior default as ground for forfeiting the contract.

[1]Reported in 175 Pac. 331.

SAME—OPTION CONTRACT—FORFEITURE. An attempted forfeiture of a lease and option to purchase after tender of the purchase price is futile.

SAME—LEASE AND OPTION CONTRACT — ABANDONMENT. Evidence of intent by the lessee to abandon property leased with option to purchase cannot be gathered from the conduct of the vendor and third persons.

PARTIES—INTERVENTION—PERSONS ENTITLED. A townsite company, interested in the sale of its lots and therefore in the operation of a shingle and a sawmill that were the subject of sale, is not entitled to intervene and contest plaintiff's action to enforce specific performance of the sale.

Appeal from a judgment of the superior court for King county, Tallman, J., entered December 17, 1917, in favor of the defendants, dismissing an action for specific performance, tried to the court. Reversed.

*Edgar C. Snyder* and *Farrell, Kane & Stratton,* for appellant.

*J. A. Coleman, S. H. Kelleran, Jesse Simmons, Almon Ray Smith,* and *Piles & Halverstadt,* for respondents.

CHADWICK, J.—Following the lead of counsel, we shall refer to the appellant as the plaintiff, the Tolt Land Company as the land company, the National City Bank of Seattle as the bank, and the Tolt Townsite Company as the townsite company, or collectively as the several defendants.

On and prior to the 20th day of May, 1916, the land company was the owner of certain property consisting of a one-acre tract upon which was a shingle mill, and a five-acre tract adjoining upon which was a sawmill. The bank was the holder of two notes which had theretofore been made by the land company and indorsed by the townsite company. The aggregate balance due on these notes at the time was $23,177.50. Both of these notes were secured by mortgages made by the

land company to the bank. On the day mentioned, one Burnett and the land company entered into a contract of lease and option to purchase, whereby the land company leased to Burnett and his assigns the two tracts, together with the shingle mill and sawmill situate thereon, also all of the machinery and equipment therein contained, for a term beginning June 1, 1916, and ending May 31, 1918, at a monthly rental of $300 per month, with the privilege of purchasing at a price of $18,750 if taken within two years, and at a price of $14,000 if the option were exercised within eighteen months after June 1, 1916.

It was further provided that Burnett or his assigns should keep the property insured at all times in an amount not less than $14,000, with loss payable to the lessor "as its interests may appear." That part of the lease providing for the application of disposition of insurance moneys in case of a loss is as follows:

"If the said property, or any of it, shall be destroyed or damaged by fire during the term of said lease, the insurance money received shall be devoted to the repairing or rebuilding of said property, if the party of the second part, or his assigns, shall determine that the application of same for said purpose will sufficiently reconstruct said property for the second party to continue operating under said lease and will so notify the party of the first part."

The contract further provided that, if Burnett or his assigns should exercise their option to purchase within the time agreed upon, the land company would convey the two tracts by "a good and sufficient warranty deed or deeds and would execute all other instruments necessary to effect the terms of the agreement."

Burnett paid the sum of $900, being three months' rent in advance, at the time the contract was executed. The bank, having a money interest in the transaction

as mortgagee, and to the extent of the full purchase price in case the option were exercised, and having been a party to the negotiations between the parties leading up to the execution of the writings, which were submitted for its approval, indorsed upon the contract the following:

"We, the undersigned, holders of valid subsisting lien claims against the property referred to in the foregoing agreement and fully described in the certain lease to which reference is made in the said foregoing agreement, do hereby, in so far as our interest appears, fully ratify, confirm and approve all of the terms and conditions of the said agreement and the said lease.

"Dated at Seattle, Washington, May 20th, 1916.
                    "National City Bank.
"(Corporate Seal)        By J. W. Maxwell, pt.
                    "J. W. Maxwell."

After the papers had been executed, Burnett assigned his interest to the plaintiff, a corporation organized for the purpose of taking over the property and of which Burnett is the principal stockholder. The sawmill was not operated, but the shingle mill was operated to a certain extent.

The mills were somewhat in disrepair and plaintiff was put to some delay, annoyance and expense in putting them in shape for operating. In consideration of this delay and expense the land company, with the approval of the bank, allowed a credit for two months' rent, which carried the rent payments over September and October, 1916.

After plaintiff had taken possession of the property, it encountered a claim of the Puget Sound Machinery Depot for $1,520, which was due from the land company for machinery which it had purchased under a conditional bill of sale and put in the mill. The claim was questioned to a certain extent by the company and

denied as an obligation by plaintiff. Pending a settlement no rent was paid. The machinery company finally took steps to enforce its claim through legal proceedings. A compromise was then reached, the amount due the machinery company was paid by plaintiff and allowed as rent to the extent of $1,390; plaintiff then paid $710 in money, being $2,100 in all, to the bank. It was received and credited upon the rent account. This paid the rent up to April 1, 1917. On April 2, $300 was paid by the plaintiff to the bank as rent for the month of April. On the 11th day of January, 1917, the shingle mill was partly destroyed by fire. The policies had been written in favor of the plaintiff, the land company and the bank. A dispute arose as to the distribution, application and ownership of the money realized upon the policies, and checks were therefore issued by the insurance companies payable jointly to the several claimants. These were indorsed by the parties and the proceeds paid into the First National Bank of Seattle under a stipulation that the money should be held subject to the decree of the court in this action.

A few days prior to the making of the deposit of the proceeds of the insurance policies, plaintiff undertook to exercise its option. The balance due, after crediting all sums paid as rent, was $10,700. This sum was tendered to the bank and to the land company under a tender which recites: "this tender being made firmly and nonconditionally, save only as to the following requirements, compliance with each and all of which is hereby demanded of you." The requirements were:

"First, a warranty deed from the land company.

"Second, a bill of sale of the personal property from the land company.

"Third, either a satisfaction or release of the mortgage held by the bank or a quitclaim deed from the bank.

"Fourth, a full discharge and release of said property from the liens of certain judgments.

"Fifth, assignments to the plaintiff by the land company and the bank of all interest in the proceeds of the insurance policies.

"Sixth, payment to the plaintiff of $199.45 deducted by one of the insurance companies from the adjusted loss under its policy, under claim by that insurance company of an obligation to it from the land company wholly independent of the policy involved.

"Seventh, indemnity against any judgment in King county superior court cause No. 116025.

"Eighth, payment of the 1915 taxes."

The defendants were further notified that the tender would be kept good by bringing suit and paying the money into the registry of the court, unless compliance was had with the several demands or conditions. The tender was refused and plaintiff brought this action to compel specific performance. A short time after the action had been brought, the land company gave notice to the plaintiff that it had forfeited the contract for the nonpayment of the rent for May, June and July, 1917; the court below held in favor of the several defendants, and from a decree dismissing plaintiff's complaint, this appeal is prosecuted.

It is the contention of the several defendants that plaintiff has forfeited its contract by the nonpayment of rent; that it abandoned the property; that it now has no interest in the proceeds of the insurance policies, and that it cannot now maintain a bill for specific performance.

Waiving for the time the questions of forfeiture and abandonment, the case really comes down to this: Whether the bank, having mortgages on the property,

agreed to release its mortgages in the event plaintiff exercised its option to purchase.

The case was tried on the theory that the contract and the indorsement made by the bank and Mr. Maxwell was a sufficient declaration of intention that the bank would release the mortgages so that the company might convey by a good and sufficient warranty deed. After the testimony had closed, the trial judge made some intimation that, in his judgment, the contract was not sufficient in terms or form to bind the bank to a release of the mortgages. Whereupon counsel for plaintiff asked leave to amend, setting up a mutual mistake in that the parties had omitted to incorporate their express agreement to that effect when the indorsement was written. The court took further testimony upon this issue, but it is our judgment that this can in no way affect the rights of the parties or the controlling equities. The contract, together with the indorsement by the bank, is in itself sufficient to charge the land company and the bank with the burden of conveying by good and sufficient deed free of all mortgages or subsisting liens held by the bank or Mr. Maxwell at the time the contract was entered into.

The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than in retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self-interest.

On the 26th day of May, 1916, the land company owned the property which plaintiff desired to lease with an option to purchase. It was willing to lease at $300 per month, and to sell within eighteen months at $14,000 and within two years at $18,500. A contract was entered into and signed by the parties. The

bank, having a financial interest, agreed that the contract might be entered into. It became, in a sense, a party to the contract. As the holder of mortgage liens, it knew of and approved a contract which, if carried out, would result in a sale of the property at $14,000, or at most, $18,500. It knew that the rent and purchase price would be paid to it, and that, if the option were exercised, the purchaser was entitled under his contract to a "good and sufficient warranty deed or deeds." As the holder of "subsisting mortgage liens," it knew the purpose of the vendor and the object of the buyer. It knew that the vendor was to take $14,000, in event, etc., as the full purchase price, and that the purchaser expected to get a title free of "subsisting mortgage liens;" that, if the option were exercised, it would receive the purchase price in part payment of a debt for which it had only "doubtful security." We cannot understand how it can be contended otherwise. But, say counsel, it would be to charge Mr. Maxwell with a lack of all business acumen to say that he would release the property upon payment of $14,000 when he had a subsisting mortgage for $21,800. But this is *non sequitur*. If the security was doubtful, it may be that the property was not worth to exceed the sale price. Some men have been content to take a chip or a whetstone in full payment of substantial obligations. Or it may be that, having "other securities to fall back on" and having faith in them, the creditor would be willing for the debtor to sell at its own price. But to exempt Mr. Maxwell of the imputation of careless conduct would be to charge his adversary with imbecile disregard of his affairs. It would be to say that he contracted to pay $14,000 and take the property subject to a mortgage of $21,800; and if he eventually got the title that would follow a "good and sufficient war-

ranty deed," that is, a deed with full covenants, he would have to pay $35,800.

But it is not for us to try out the business ability of the contracting parties. Whatever their capacity, they have made their own contract and for themselves. As was so well said by that sturdy yeoman of the law, the late Judge Dunbar:

"These parties have made a law for themselves," and "but we are convinced that as long as people are privileged under the law to make contracts for themselves, if they are unwise enough to make contracts which are burdensome, the law cannot relieve them. . . . . They solemnly executed this contract, and in the absence of fraud it is conclusively presumed to speak the minds of the contracting parties. Any other construction would destroy the force and effect of all written obligations and leave everything to the chance of slippery memory, the very thing which a written contract is intended to guard against." *Pease v. Baxter,* 12 Wash. 567, 41 Pac. 899.

And, as there held, whether we give the approval of the holder of subsisting liens of a contract to convey at a certain price by a good and sufficient deed a technical meaning or the meaning ordinarily given to such words, the conclusion is irresistible that the bank agreed to accept the purchase price and discharge its lien.

Neither is the bank entitled to hold as its own or as a payment on the debt of the land company the proceeds of the insurance policies. The greater portion of the briefs are taken up with a discussion of the rights of the parties under option contracts to take the proceeds of insurance policies. It is asserted that, under the great weight of authority, if the contract be a mere option and not a present sale, no element of title, either legal or equitable, is in the optionee, and the

21—103 WASH.

contract being wholly executory and subject to breach at will, that the proceeds of a policy goes to the owner. With this rule we have no present quarrel, but it does not measure this case.

This is a suit in equity, and the only object we have is to compel the doing of such equity as grows out of the contract. The subject-matter of the sale was the land, the mills and machinery. The policies were made out in the names of the several parties to this suit, and if there were no other provision for the distribution of the insurance moneys, the laws would supply the words "as their interests may appear." It may be granted that the purchaser or the plaintiff would not be entitled to the insurance money if it had not exercised its option, but when it exercised its option it was entitled to the benefit of its bargain. That is to say, if the mills with the machinery, or if any of them, had been destroyed in whole or in part by fire, it is entitled to the insurance money, for equity will take no account of a change in form or character of property. This works complete equity between parties to this suit, for it gives to the purchaser his value in property, and with the payment of the money into the registry of the court, the bank will satisfy the contract and give to the purchaser and the land company all that it demanded.

Our conclusion consists with paragraph 3 of the contract. It was agreed that the purchaser should keep the property insured for at least $14,000, payable to the land company as its interests may appear. The covenant to insure was for the benefit of the security. In this connection, paragraph 3 of the contract may be re-read.

So that, granting the rule contended for by counsel, it is plain that the parties contracted against the rule,

and the purchaser had option to apply the proceeds of the policies to repairing or rebuilding. Paragraph 3 can bear no other meaning than that the integrity of the security should be maintained, either in money or in property, pending the exercise of the option or the payment of $14,000 which would terminate the contract rights of the parties. The prime purpose of the land company and the bank was the payment of $14,000, and they can have no possible interest in the source of the payment.

It would be idle to pursue the abstract propositions advanced by counsel, for, as it has been said, the parties have made the law of their case, and to give either party a right or an advantage that is not reserved in the contract would be doing a wrong which, in theory at least, equity is incapable of doing.

Neither do we find merit in the contention that the tender was not good. The contract provides:

"If and when the party of the second part, or his assigns, shall exercise the privilege of purchase, herein granted, and shall pay the purchase price in full, as herein stipulated, then the party of the first part shall, and hereby agrees to, convey said property to the party of the second part, or his assigns, by good and sufficient warranty deed, or deeds, and the party of the first part further agrees to execute such other instruments or documents as may be necessary to fully effect the terms of this agreement."

If the abstract disclosed infirmities that put suspicion upon the title, it was the right of appellant to demand that they be cleared before accepting a deed. We understand that the items complained of are disposed of, in any event, and are no longer a subject of controversy.

The attempted forfeiture was unavailing. The acceptance of the April rent was a waiver of any prior

default, if the default had not been otherwise explained, and the attempted forfeiture after the tender of the purchase price was futile.

It is claimed that plaintiff abandoned the contract and the property. Without reviewing the facts in detail, it is enough to say that, while it is true that the land company put some machinery in the mill and the railway company tore out its spur, we find no evidence of intent on the part of the plaintiff to abandon. Its intent is to be gathered from its conduct, and not from the conduct of the land company or third parties.

The Tolt Townsite Company intervened on this theory; that it is the owner of the townsite and the property remaining unsold in the town of Tolt; that it is to its interest that the mills should operate, and that there was a sort of understanding between it and the land company that the mill should continue to be operated, and that this was the cause moving it to become a surety for the land company upon the notes held by the bank; and there being no certainty or assurance that the plaintiff will operate the mills, and specific performance being a matter of grace to be exercised within the sound discretion of the court, and not at all if the decree would operate to the injury of innocent third parties, the court ought now to deny a recovery because of possible harm to it. It seems to require no argument to meet this contention. The townsite company was not a party to the contract, nor can we assume that the plaintiff will not operate the mills. On the contrary, the presumption is that it will operate the mills, as it is not likely that it would pay $14,000 for two pieces of property, one of which is vacant and the other idle, with no intention of turning its bargain to account.

The plea of the townsite company cannot be sustained upon legal or equitable grounds.

The decree of the lower court is reversed. The case will be remanded with instructions to enter a decree of specific performance.

MAIN, C. J., HOLCOMB, MOUNT, and MACKINTOSH, JJ., concur.