[No. 34597.   Department One.   March 26, 1959.]

JOE DAMAN, *Respondent*, v. WALTON LUMBER COMPANY, *Appellant*.[1]

FINLEY, J., dissents.

*Cooper & Cooper*, for appellant.

*John W. Schumacher* and *John H. Kirkwood*, for respondent.

OTT, J.—During the month of June, 1954, Joe Daman, doing business as Daman Logging Company, entered into

[1]Reported in 337 P. (2d) 37.

two separate timber sale contracts with the state of Washington. The contracts gave Daman the right to remove certain timber and to pay the state on a stumpage basis as logged. On one of the tracts (hereinafter designated as tract "A"), Daman was required to make an advance stumpage deposit to the state in the sum of approximately sixteen thousand dollars. On the other tract (hereinafter designated as tract "B"), Daman was required to make an advance stumpage payment of approximately $2,230.

On or about April 5, 1955, Daman commenced logging on tract "A" and entered into an oral agreement to deliver the logs to the Walton Lumber Company (hereinafter referred to as Walton). In accordance with this agreement, Walton advanced to Daman the sixteen thousand dollars which he had previously remitted to the state as an advance stumpage payment. July 29, 1955, Daman entered into a written contract for the sale of the logs to Walton, as follows:

"LOG PURCHASE AGREEMENT

"Under this ............ day of July 1955, JOE DAMAN of Forks, Washington, hereinafter referred to as 'Owner,' agrees to sell to WALTON LUMBER COMPANY, a corporation, hereinafter referred to as 'Buyer', certain timber in log form from property hereinafter described, and upon the full terms and conditions herein set out.

"RECITALS:

"A. The OWNER has purchased timber from the State of Washington on the following described land situated about thirty (30) miles southeast of Forks, Washington: [Legal description.]

"B. The OWNER has also purchased from the State of Washington timber on the following described land situated about one-half mile southwest of the townsite of Forks, Washington: [Legal description.]

"C. The BUYER does now agree to purchase and the OWNER agrees to sell all of the logs developed in the logging operations from said lands.

"D. It is anticipated that approximately seven (7) million feet of logs will be taken from the first described lands and approximately three (3) million feet of logs will be produced from the second described lands, making a total of about ten (10) million feet, mostly hemlock and white fir in even proportions, and the balance of cedar and spruce

in about equal proportions. The grade and species of logs cannot now be exactly and directly determined. Neither can the delivery point of these logs be ultimately determined upon at the present time and will have to be determined as directed by the BUYER.

"Now, THEREFORE, IT IS HEREBY MUTUALLY AGREED:

"I. That the BUYER will pay for these logs based upon a ·delivery by the OWNER at a dumping and booming ground in Puget Sound, Washington, as determined by the BUYER. [Details of payment.] . . .

"IV. It is contemplated that the BUYER will advance to the OWNER all sums necessary to promptly pay for all stumpage due from the OWNER on said lands and will likewise advance on the purchase price of these logs from time to time such amounts as is reasonably necessary to carry ·out the logging operations; Provided only, that said advances shall in no event exceed the purchase price of said logs as herein agreed upon.

"V. The BUYER shall at all times have the right to examine the books of the OWNER to the extent reasonably necessary to determine the fact that all logs purchased by the BUYER are free from any liens for stumpage, labor, or any other charges that might arise against the BUYER, and should at any time the said charges exceed the actual purchase price of these logs, then the BUYER at its option may take possession of the said timber tracts and log the same paying to the State the sum due for stumpage for the timber removed.

"VI. The OWNER has been delivering logs from the lands herein described since approximately May 10, 1955, and has delivered to date approximately two and one-half million feet. Prior to the first delivery of logs the BUYER advanced to the OWNER the sum of $16,009.60 on or about the 5th day of April, 1955. Since the delivery of logs has started the BUYER has advanced on the purchase price of the logs $114,338.14.

"VII. It is now mutually agreed that the full purchase price of the logs already delivered together with the logs hereafter to be delivered shall all be determined under the price formula as set forth herein. The advance of $16,009.60 made on the 5th day of April, 1955, shall be prorated over the full purchase price of all of the logs now bought under this contract by allotting $2.00 per M feet to all logs delivered including those heretofore delivered as well as those

hereafter delivered under this contract, until the full $16,009.60 prepayment shall have been fully liquidated.

"DATED this 29th day of July, 1955."

March 27, 1956, Daman assigned his state timber rights on tract "B" to Spoelstra Brothers Logging Company. Spoelstra Brothers logged the tract and disposed of the timber to another concern. When Daman completed logging the timber on tract "A", he demanded of Walton payment for the logs delivered. Walton refused payment, contending that it had been damaged by Daman's refusal to deliver the logs from tract "B", and demanded of Daman the amount of its damage in excess of the balance due for the logs delivered.

Daman commenced this action against Walton and prayed for judgment in the amount due him of $18,905.68.

Walton answered the complaint, admitting that the amount claimed was due, but alleged, as an affirmative defense and cross-complaint, that the plaintiff had breached the contract by refusing to deliver the logs from tract "B", and that the cross-complainant had been damaged in the sum of thirty-six thousand dollars, less the sum due the plaintiff on his cause of action.

The plaintiff's answer to the affirmative defense and cross-complaint denied there had been a breach of the contract.

The trial to the court resulted in a judgment in favor of Daman and a dismissal of Walton's cross-complaint. In addition, the court entered a finding of fact as to the amount of damage suffered by Walton, in the event the court should be reversed on appeal, as follows:

"That, if the assignment from plaintiff to said Spoelstra Brothers Logging Company and the subsequent failure of plaintiff to deliver the Mill Creek logs to defendant constituted a breach of the contract between the plaintiff and defendant, the Court finds that the defendant would have been damaged in the sum of $28,974.50." Finding of Fact No. 9.

The defendant appeals, assigning error to the dismissal of the cross-complaint. Plaintiff cross-appeals, assigning

error to the above finding of fact. We will first discuss appellant Walton's assignments of error.

Appellant assigns as error the court's conclusions that the contract required the respondent to deliver to appellant only such logs as were cut by him, that respondent's assignment of the logging rights to the timber on tract "B" was not a breach of the contract, and that appellant's cross-complaint should be dismissed.

The trial court based its conclusion that the respondent was required, by the contract, to deliver to appellant only such logs as were cut by respondent upon finding of fact No. 5, which is as follows:

"That throughout said written agreement, particularly in Paragraphs I, I(c), II, III, IV, V and VI, numerous references are made to the 'OWNER' in connection with matters pertaining to delivery of logs, payment for same, alternate methods of transportation, performance of the state timber contract under which the timber had been purchased by the plaintiff [respondent], contract advances, examination of books, and prior delivery of logs. That all of said references to the 'OWNER' were references to the plaintiff personally."

■ We do not disagree with the finding that the word "owner" in the cited paragraphs of the contract referred to respondent personally. We do disagree with the conclusion of the court that it was the intention of the parties that only those logs which respondent elected to deliver to appellant were to be covered by the contract, for the following reasons:

(1) The contract defines with certainty the area (including tract "B") from which the timber was to be produced, and provides that "JOE DAMAN . . . agrees to sell to WALTON LUMBER COMPANY . . . certain timber in log form from property hereinafter described, and upon the full terms and conditions herein set out."

(2) At the time the contract was executed, respondent owned the timber rights to both tracts "A" and "B". The sixteen thousand dollars was to be repaid at the rate of two dollars per thousand feet of logs cut (§ 7). There were not enough logs in tract "A" to repay the advance at the two-

dollar rate (recital D); hence, it must have been within the contemplation of the parties, at the time the contract was executed, that it would be necessary that logs be cut on tract "B" in order to repay the advance.

(3) The contract provides that the buyer could take over and log "the said timber *tracts*" (Italics ours.) under certain conditions enumerated in the contract (§ 5).

(4) The contract provides a fixed purchase price for the logs at such dumps as appellant should select. The construction which the trial court placed upon the contract would permit the respondent to avoid his obligation under the contract by selling the timber rights to a third party, and thus deprive the appellant of the benefit of its bargain.

In *Long-Bell Lbr. Co. v. National Bank of Commerce*, 35 Wn. (2d) 522, 214 P. (2d) 183, we quoted with approval from *Carnation Lbr. & Shingle Co. v. Tolt Land Co.*, 103 Wash. 633, 175 Pac. 331, as follows:

" 'The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self-interest.' "

Applying this rule to the instant case, we conclude that there would have been no reason for the contracting parties to put a fixed price on the logs if respondent could avoid the effect of the contract at any time by selling the timber rights to a third party. Assuming, *arguendo*, that the contract is subject to two interpretations, it will be construed to preserve the rights of both parties, rather than to destroy the rights of either. *Asia Inv. Co. v. Levin,* 118 Wash. 620, 204 Pac. 808, 32 A. L. R. 578.

We conclude that, by the contract, respondent agreed to sell to appellant all of the timber logged on both tracts "A" and "B", whether he logged the tracts himself or caused them to be logged by others, and that when, on March 27, 1956, respondent assigned the timber rights on tract "B" to Spoelstra Brothers Logging Company, which admittedly did not deliver the logs to appellant, it consti-

tuted a breach of the contract, for which respondent was answerable in damages

Because of the conflicting evidence, this court is unable to determine from the record the amount of damages to which appellant may be entitled. Both appellant and respondent agree, in their briefs, that the court's computation was incorrect.

The judgment is reversed and the cause remanded with instructions to reinstate the cross-complaint and grant appellant a new trial limited to the issue of damages only. Appellant will recover costs.

MALLERY, HILL, and HUNTER, JJ., concur.

FINLEY, J. (dissenting)—This is an action arising out of a written contract. The plaintiff is a sole proprietor engaged in the logging business. Among other things, the defendant operates a lumber mill in the city of Everett.

In June, 1954, plaintiff entered into two separate timber sale agreements with the state of Washington. The agreements did not involve the sale of any land. They gave the plaintiff the right to remove certain timber and to pay the state on a stumpage (as logged) basis. On one of the tracts involved (the "Snahapish" tract, or tract "A"), the plaintiff was required to make an advance stumpage deposit to the state of approximately $16,000.00. (This figure recurs throughout this opinion, and it is rounded off for convenience.) On the other tract (the "Mill Creek" tract, or tract "B"), plaintiff was required to make an advance stumpage payment to the state of about $2,230.00.

When the plaintiff started selling logs to the defendant (in the spring of 1955), he had commenced logging operations only on tract "A". At that time, the defendant advanced to the plaintiff the amount of the advance stumpage deposit which plaintiff had made to the state for the timber on tract "A".

On July 29, 1955, the parties entered into the written contract which is the subject of this action. At that time plaintiff was still logging only tract "A". On March 27, 1956, plaintiff assigned his state timber rights for tract "B" to an-

other logging company known as Spoelstra Brothers, without ever commencing logging operations thereon. Under the assignment from plaintiff, Spoelstra Brothers were not required to abide by the contract between plaintiff and defendant.

After completing the logging operations on tract "A" plaintiff demanded final payment from the defendant. Defendant refused to make any further payments on the ground that plaintiff had breached the contract by assigning his timber interest in tract "B" to Spoelstra Brothers. Plaintiff then commenced this action, praying for a judgment in the amount of all sums owing under the contract. Defendant interposed a cross-complaint in which it alleged a breach of the contract by plaintiff, praying for damages as a result thereof. Defendant admitted owing all the sums as alleged by the plaintiff. Consequently, the only dispute concerns the allegations of the cross-complaint as to damages for a breach of contract by the plaintiff. After a trial to the court, plaintiff's demurrer to defendant's cross-complaint was sustained. Judgment was entered dismissing the cross-complaint. Defendant has appealed. (In an attempt to avoid the necessity of a new trial in the event of a reversal on appeal to this court, the trial judge entered findings as to the damage defendant had suffered, if it should be held that the contract had been breached by the plaintiff-respondent. Plaintiff has cross-appealed urging that the trial court erred in computing the damages.)

Both parties assert that when the contract, set out below,[2] is examined as a whole, it is clear and unambiguous. In the light of these assertions, it seems somewhat anomalous that we have this hard-fought, lengthy court litigation, with each side contending that it knows the "one true meaning" of the words used in the contract. The situation seems to offer strong support for Professor Corbin's observations relative to the subject, the one true meaning of contractual language. 3 Corbin on Contracts, 13 through 16, § 535:

"There is no single rule of interpretation of language, and there are no rules of interpretation taken all together, that

[2]For full context of Footnote 2, see last page of Opinion.

will infallibly lead to the one correct understanding and meaning. In understanding the variable expressions of others, men must do the best they can and results must be determined even though the understanding may be faulty. *There is in fact no 'one correct' meaning of an expression;* and the party choosing the expression may have no clear and conscious meaning of his own. In reading each other's words, men certainly see through a glass darkly; and yet it is necessary for men to act upon their understanding, and it is necessary to hold men responsible for inducing others thus to act. (Italics mine.)
" . . .

"Sometimes it is said that 'the courts will not disregard the plain language of a contract or interpolate something not contained in it'; also 'the courts will not write contracts for the parties to them nor construe them other than in accordance with the plain and literal meaning of the language used.' It is true that when a judge reads the words of a contract he may jump to the instant and confident opinion that they have but one reasonable meaning and that he knows what it is. A greater familiarity with dictionaries and the usages of words, a better understanding of the uncertainties of language, and a comparative study of more cases in the field of interpretation, will make one beware of holding such an opinion so recklessly arrived at.

"For statements such as those quoted above, the present writer might substitute something like the following: If, after a careful consideration of the words of a contract, in the light of all the relevant circumstances, and of all the tentative rules of interpretation based upon the experience of courts and linguists, a plain and definite meaning is achieved by the court, a meaning actually given by one party as the other party had reason to know, it will not disregard this plain and definite meaning and substitute another that is less convincing. Such a statement may be a mere truism; but it is not likely to lead to cocksure erroneous judgments."

In the trial court both parties attempted to enlighten the trial judge as to the "one true meaning" of this contract by legal reasoning from analogous cases. As a consequence of that manner of presentation of the case, we have little in the record to aid us in determining what in fact was *the parties' intended contract*. See 3 Corbin, *supra*, chapter 24, especially §§ 537, 538. Precedents are of little value in cases

of this character, "for at best they merely show that, in a particular case, an implication was or was not made." *Kanaskat Lbr. & Shingle Co. v. Cascade Tbr. Co.* (1914), 80 Wash. 561, 142 Pac. 15.

In stating that this contract is clear and unambiguous, it seems to me that the parties can only reasonably mean to say that the written contract embodies the whole of their agreement or all of their contractual obligations. It is incumbent upon the court then to first interpret the language of the contract to determine what the parties have said with respect to their contractual obligations. After that step, we can determine the legal operation or effect of what they intended to be their whole contract; that is, we must construe the contract.

The trial judge found as a fact, and no error is assigned thereto, that all references to the "Owner" in the contract are references to the *respondent personally*. This is helpful in properly interpreting the words used to arrive at the intent of the parties as expressed in the writing.

Paragraphs A and B of the contract are mere recitals of the fact that respondent purchased the timber rights to tracts "A" and "B" from the state. Paragraph C is a recital of what is being bought and sold under this contract; its ambiguity gives rise to this dispute, and it must be examined in the light of the whole contract. Paragraph D is a recital of the anticipated log yield from the two tracts.

Paragraph I sets out the method of computing the purchase price of the logs delivered by the respondent. Paragraph II is a further discussion of the price as related to transportation costs. Paragraph III sets out that the contract was only intended as a purchase and sale of logs (not standing timber), and that the respondent was not the agent of appellant. Paragraph IV calls for appellant to pay all stumpage due from respondent to the state, and provides for an advance from appellant to respondent to "carry out the logging operations." Paragraph V gives the appellant authority to examine respondent's books at any time to insure that the logs purchased were free of liens; and it further

gives the appellant authority to take possession of the timber tracts and log them, *if at any time the lien charges exceeded* the actual purchase price of the logs. Paragraph VI sets out the fact that respondent had been delivering logs to appellant since about May 10, 1955, and it sets out the advances appellant had made to respondent prior to the contract date. Finally, Paragraph VII refers to the advance of $16,000 made on April 5, 1955, and spells out that it is to be prorated by allocating it over all logs heretofore and hereafter delivered at a ratio of $2.00 per M feet of logs.

In support of his interpretation of the contract, appellant points specifically to paragraphs D and VII. He contends that, since the parties anticipated only seven million board feet of logs from tract "A", they must have intended to require respondent to log tract "B" also, as it would take at least eight million board feet of logs for proration of the advance of sixteen thousand dollars as provided in paragraph VII.

After careful examination, I am not persuaded by this line of argument for the following reasons: (1) It is undisputed, and the contract recites that the sixteen thousand dollars advance *was made prior to the execution of the contract by several months*, and that, at that time, respondent was logging *only* tract "A". There is nothing in either the contract or the record to show that appellant even knew respondent had the timber rights to tract "B" when the sixteen thousand dollars advance was made. (2) It is undisputed that the foregoing advance was in the exact amount of the advance-stumpage deposit which respondent made to the state *for the purchase of the timber rights to tract "A"*. (3) The reasonable import of the language used in paragraph D ("will be taken") is that the parties were referring to future cutting of timber—*i.e.*, cutting after the date of the contract; whereas, in paragraph VII, the contract specifically states that the advance is to be prorated "to all logs delivered *including those heretofore delivered* as well as those hereafter delivered under this contract." (4) The contract required appellant to pay promptly all stumpage due to the state from

the owner. I believe these provisions clearly required appellant to make the sixteen thousand dollars advance for the logs to be delivered from tract "A".

In addition to the above factors, there is undisputed evidence in the record that appellant never paid the advance stumpage deposit on tract "B". This would seem to imply that appellant did not consider that a stumpage deposit was due and payable as to tract "B" until respondent actually commenced logging operations on tract "B".

I find no contractual provision requiring respondent to log tract "B". Examining the contract as a whole I find nothing to indicate that the parties had any intent with respect to a situation such as developed and gave rise to this dispute. With respect to the type of contract under consideration, Professor Corbin has this to say:

" . . . At the very least, the promisor binds himself not to sell any of his output to any third person. He has the limited option between selling to the promisee and not producing at all.

"In cases like this the contract is not aleatory, because the promise of each is conditional upon the same event. Suppose a contract for the sale at a stated rate of 'all the pineapples he may grow'; the condition is uncertain, but the performances promised are equally uncertain. No pineapples, no pay. Some pineapples, some pay. Many pineapples, much pay. A uniform ratio is maintained between goods delivered and amount to be paid. The performance of the condition is at the option of the seller, and the buyer has no option whatever; but this fact does not make the contract aleatory.

"The promisor may or may not promise in addition that he will maintain his production at some stated level, or that he will continue to run the mine or factory or farm with diligence. Such subsidiary promises add materially to the limitation on the promisor's freedom of action and may add value to the promise given. No such subsidiary promise and no such added value are necessary to the sufficiency of the promise as a consideration for a return promise. Even though the promisor retains the privilege of closing down the works and of producing and delivering nothing, he has given a sufficient consideration in promising to sell his entire output, whatever it may be, to the promisee and none to others." 1 Corbin on Contracts 523 through 525, § 158.

The foregoing passage from Corbin on Contracts and the decision in the *Kanaskat* case, *supra,* indicate the legal operation of a contract in which the parties have embodied no provision requiring one party to maintain his production or refrain from disposing of his whole interest in the business. The contract is valid without such a provision. The parties agree that the written contract embodies their joint intent at the time the contract was drawn. It is my view that the parties did not intend to prevent respondent from terminating his contractual obligations by disposing of the timber rights acquired from the state as to tract "B". Respondent, therefore, did not breach the contract when he assigned his timber rights in tract "B" to Spoelstra Brothers.

I am firmly convinced that the judgment of the trial court should be affirmed; hence, this dissent discussing the reasons for my disagreement with the majority opinion.

"LOG PURCHASE AGREEMENT

"Under this —— day of July, 1955, JOE DAMAN of Forks, Washington, hereinafter referred to as 'Owner,' agrees to sell to WALTON LUMBER COMPANY, a corporation, hereinafter referred to as 'Buyer,' certain timber in log form from property hereinafter described, and upon the full terms and conditions herein set out.

RECITALS:

"A. The OWNER has purchased timber from the State of Washington on the following described land situated about thirty (30) miles southeast of Forks, Washington:

State Sale App. No. 23608—April 5, 1955. SW ¼-NW ¼ NE ¼-SW ¼ SW ¼-SW ¼ SW ¼-SE ¼ All in Sec. 10, Twp. 26 N. R. 11 W, containing 160 acres, more or less, according to the government survey thereof.

"B. The OWNER has also purchased from the State of Washington timber on the following described land situated about one-half mile southwest of the townsite of Forks, Washington:

SW ¼-NE ¼ NE ¼-NE ¼ NE ¼-SE ¼ In Sec. 15, Twp. 28 N. R. 13 W, containing 120 acres, more or less, according to the government survey.

"C. The BUYER does now agree to purchase and the OWNER agrees to sell all of the logs developed in the logging operations from said lands.

"D. It is anticipated that approximately seven (7) million feet of logs will be taken from the first described lands

and approximately three (3) million feet of logs will be produced from the second described lands, making a total of about ten (10) million feet, mostly hemlock and white fir in even proportions, and the balance of cedar and spruce in about equal proportions. The grade and species of logs cannot now be exactly and directly determined. Neither can the delivery point of these logs be ultimately determined upon at the present time and will have to be determined as directed by the BUYER.

"Now, THEREFORE, IT IS HEREBY MUTUALLY AGREED:

I.

"That the BUYER will pay for these logs based upon a delivery by the OWNER at a dumping and booming ground in Puget Sound, Washington, as determined by the BUYER. The purchase price shall be the total of three items herein set forth computed as follows, namely:

(a) The amount of stumpage as paid to the State of Washington for the timber removed and logged from the said land.

(b) The sum of Eighteen Dollars ($18.00) per M feet Puget Sound Log Scaling & Grading Bureau water scale.

(c) The cost to the OWNER of the trucking of said logs from the point of loading in the woods to the point of delivery as specified by the BUYER, not to exceed the amount per M feet set up by the State Public Service Commission for the hauling of said logs over the road, plus any occupational tax assessed to the said OWNER because of the said transportation charge.

II.

"It is further expressly understood and agreed that the BUYER may furnish the transportation for said logs from the woods to point of delivery in which event the price of the logs delivered by the OWNER shall be the total of the sums computed under sub-paragraphs (a) and (b) above. Likewise, it is understood and agreed that should the OWNER personally furnish transportation of the said logs, then the actual cost of said transportation, not to exceed the charge set up by the State Public Service Commission, shall be included in the purchase price of the logs rather than the amount as set forth in paragraph I, sub-section (c).

III.

"The cost of scaling the said logs water scale shall be borne by the BUYER. Nothing herein contained shall relieve the OWNER from his full responsibility to the State of Washington for the proper performance of his contract for the pur-

chase of the timber herein involved, and the said OWNER is wholly an independent operator and not an agent of the BUYER, and will hold the BUYER harmless from any claims for labor or other charges or expenses that may become a lien against these logs, this being solely the purchase and sale of logs.

IV.

"It is contemplated that the BUYER will advance to the OWNER all sums necessary to promptly pay for all stumpage due from the OWNER on said lands and will likewise advance on the purchase price of these logs from time to time such amounts as is reasonably necessary to carry out the logging operations; Provided only, that said advances shall in no event exceed the purchase price of said logs as herein agreed upon.

V.

"The BUYER shall at all times have the right to examine the books of the OWNER to the extent reasonably necessary to determine the fact that all logs purchased by the BUYER are free from any liens for stumpage, labor, or any other charges that might arise against the BUYER, and should at any time the said charges exceed the actual purchase price of these logs, then the BUYER at its option may take possession of the said timber tracts and log the same paying to the State the sum due for stumpage for the timber removed.

VI.

"The OWNER has been delivering logs from the lands herein described since approximately May 10, 1955, and has delivered to date approximately two and one-half million feet. Prior to the first delivery of logs the BUYER advanced to the OWNER the sum of $16,009.60 on or about the 5th day of April, 1955. Since the delivery of logs has started the BUYER has advanced on the purchase price of the logs $114,-338.14.

VII.

"It is now mutually agreed that the full purchase price of the logs already delivered together with the logs hereafter to be delivered shall all be determined under the price formula as set forth herein. The advance of $16,009.60 made on the 5th day of April, 1955, shall be prorated over the full purchase price of all of the logs now bought under this contract by allotting $2.00 per M feet to all logs delivered including those heretofore delivered as well as those hereafter

delivered under this contract, until the full $16,009.60 pre-payment shall have been fully liquidated.

"Dated this 29th day of July, 1955.

                    JOE DAMAN

                                        OWNER
                    WALTON LUMBER COMPANY,
                         a corporation,
                    BY CLYDE WALTON

                                        BUYER"

April 20, 1959. Petition for rehearing denied.