[Civ. No. 4463. Second Appellate District, Division Two.—April 29, 1926.]

# G. O. LANGENBERG, Respondent, v. GEORGE F. GUY, Appellant.

[1] CONTRACTS—CONTINUING EMPLOYMENT—VOLUNTARY SALE OF BUSINESS.—Where a party to a contract of employment obligates himself by either an express or an implied agreement not to disable himself from continuing the employment for a stipulated time, he will make himself liable for breach of contract if, by a sale of his business before the expiration of the stipulated period, he voluntarily puts it out of his power to continue his employment to the end of its term in the manner agreed to by him.

[2] ID.—UNINTERRUPTED EMPLOYMENT—IMPLIED OBLIGATION—BREACH —DAMAGES.—In the absence of some provision in a contract of employment which tends to negative the implication that the employment will continue uninterruptedly during a specified term, one who has bound himself to employ another during a definite term for a compensation the amount whereof can be earned and determined only by an actual performance of the services over the whole of the stipulated period, will render himself liable for damages for breach of contract if he makes a disposition of his affairs which renders it impossible for him to receive the services in the manner contemplated by the contract.

[3] ID.— HIRING OF TRUCK FOR YEAR—SALE OF BUSINESS.—A contract, consisting of a written proposal that in consideration of the purchase by plaintiff of a certain truck outfit, defendant will employ plaintiff's truck and driver for lumber hauling for a period of one year, "as our business warrants," at specified rates, and the acceptance of said proposal by plaintiff, who purchases said truck outfit and commences hauling lumber for defendant, contains no express covenant by defendant that he will not sell his lumber business prior to the year's expiration, thereby putting it out of his power to continue for one year to furnish lumber for hauling, and an implied undertaking to that effect may not be imported into said contract.

[4] ID.—MANAGEMENT OF BUSINESS — SALE — INABILITY TO FURNISH LUMBER FOR HAULING.—Under said contract, defendant was the sole judge of how his lumber business should be conducted, and, as he did not obligate himself to furnish plaintiff with any particular amount of lumber for hauling, defendant had the

---

1. Breach of contract of employment by discontinuance of business, see notes in 6 Ann. Cas. 236; 6 L. R. A. (N. S.) 63. See, also, 18 R. C. L. 515.

right to reduce his business to the minimum, or even to close his establishment; and he likewise had the right to sell it and get rid of it, thereby putting it out of his power to furnish plaintiff with any more lumber for hauling, and defendant's act in so doing did not constitute a violation of any express or implied term of said contract.

[5] ID. — IMPLIED OBLIGATIONS — CONSIDERATION.—Defendant's express obligations under said contract having been such that an undertaking on his part not to sell his lumber business during the year could not be implied, the mere fact that defendant received a consideration for his promise would not bind him not to sell said lumber business. (On denial of rehearing.)

[6] ID.—CONSIDERATION—INTENT.—The fact that defendant received a consideration for his promise was an element to be considered in arriving at the intention of the parties, but the mere receipt of a consideration, regardless of its nature or of its value, did not conclusively evidence an intention that defendant was not to sell his business during the term of the employment or hiring. (On denial of rehearing.)

[7] ID. — EXPECTATIONS — OBLIGATIONS.—The fact that plaintiff may reasonably have expected that the business would be carried on by defendant throughout the year did not give plaintiff cause to complain of defendant's act in disposing of his business before the expiration of the year, where the contract entered into did not obligate defendant to refrain from frustrating plaintiff's expectation. (On denial of rehearing.)

---

(1) 39 C. J., p. 76, n. 12.    (2) 39 C. J., p. 76, n. 12.    (3) 39 C. J., p. 77, n. 21 New.    (4) 13 C. J., p. 520, n. 6 New; 39 C. J., p. 77, n. 21 New.    (5, 6) 39 C. J., p. 77, n. 21 New.    (7) 39 C. J., p. 77, n. 21 New.

APPEAL from a judgment of the Superior Court of Los Angeles County. Thos. O. Toland, Judge. Reversed.

The facts are stated in the opinion of the court.

G. C. DeGarmo and H. B. Cornell for Appellant.

Bordwell & Mathews and W. W. Hyams for Respondent.

FINLAYSON, P. J.—This is an action to recover damages for the alleged breach of a contract. Judgment passed for plaintiff. Defendant, appealing from that judgment, claims, among other things, that his conduct did not amount to a breach of his agreement. If this contention be well taken

it is determinative of the case, and in that event it will not be necessary to consider any of the other points presented by the appeal.

Defendant offered in writing to employ plaintiff's truck and driver for the hauling of lumber for one year if plaintiff would purchase a certain Indiana truck outfit then owned by defendant's son-in-law, one Arthur L. Knudson. When he made the proposal, August 6, 1920, defendant was the sole owner of a lumber business carried on by him in the city of Los Angeles under the name of Pico Heights Lumber Company. The instrument which evidences the proposal, the italics being ours, is as follows:

"August 6, 1920.

"Mr. G. O. Langenberg,
    "Los Angeles, Calif.
"Dear Sir:

"In consideration of the purchase of the Indiana truck outfit from our Mr. Knudson we will employ your truck and driver for lumber hauling for a period of one year from date of delivery of new truck, *as our business warrants.* This is based on city hauls, excluding the shoestring strip and San Fernando district, at $2.00 per M. board feet and the prevailing rate to outside points, and on loads of from 3000 to 6000 feet.

"[Signed] Pico Heights Lumber Company,
                "By Geo. F. Guy."

Plaintiff claims that some time prior to September 25, 1920, he purchased the truck of Knudson in accordance with defendant's offer; that such purchase became and was a sufficient executed consideration for defendant's promise; and that thereupon defendant immediately became legally obligated to perform his promise to employ plaintiff's truck and driver in the hauling of lumber for the one-year period mentioned in the written offer. Plaintiff commenced hauling lumber for defendant on September 25, 1920, under the terms of the written offer, and continued to do so until November 12, 1920, on which day defendant sold his business to a third party and thereupon notified plaintiff that, as he did not have any more business, he would have no more hauling for him to do. There is no suggestion that the sale of the business was not *bona fide* in every particular.

Respondent claims that appellant, by selling his business, voluntarily put it out of his power to perform his part of the contract, thus preventing performance by respondent, and that such prevention of performance constituted a breach of the contract by appellant, entitling respondent immediately to sue for damages. Appellant, on the other hand, claims that his contract contains neither an express nor an implied undertaking on his part not to sell his business; that, therefore, he could sell as he did without thereby violating his agreement; and that his sale of the business and his consequent inability to continue hiring respondent's truck and driver did not subject him to damages as for a breach of contract.

The case turns upon the proper interpretation to be put upon the contract as evidenced by appellant's written offer. As in most cases of the kind, but slight if any assistance can be derived from judicial decisions on other contracts, save in so far as the reasoning of the courts in other cases may prove helpful as guides to a correct interpretation of the particular contract under consideration. In the main each case must rest upon it own bottom.

The words of the contract which are of vital significance— the ones which we think are determinative of appellant's right to sell his business prior to the expiration of one year —are the words, "as our business warrants." With this language in the contract appellant's only undertaking was to employ the truck and its driver during the year as warranted by his business. Bearing in mind this provision, we now proceed to consider the nature of appellant's obligation in so far as his right to sell his business is concerned.

There is no basis for a contention that appellant has violated any express term of his contract. In no part of the instrument signed by him does he expressly covenant not to sell his business. Therefore, whether he could rightfully sell it during the year without breaching his contract with respondent depends entirely upon whether the contract imports an *implied* obligation on appellant's part not to sell the business prior to the year's expiration. That, in the last analysis, is the ultimate question presented for solution. If the contract does import such an implied undertaking on appellant's part, then upon selling the business before the end of the year he would become liable as for a breach

of his agreement. [1] For of course it must be conceded that where a party to a contract of employment obligates himself by either an express or an implied agreement not to disable himself from continuing the employment for a stipulated time, he will make himself liable in damages for breach of contract if, by a sale of his business before the expiration of the stipulated period, he voluntarily puts it out of his power to continue the employment to the end of its term in the manner agreed to by him. (*White* v. *Lumiere North American Co.,* 79 Vt. 206 [64 Atl. 1121], and notes to that case in 6 L. R. A. (N. S.), p. 807 et seq.) [2] It may also be conceded that, in the absence of some provision in a contract of employment which tends to negative the implication that the employment will continue uninterruptedly during a specified term, one who has bound himself to employ another during a definite time for a compensation, the amount whereof can be earned and determined only by an actual performance of the services over the whole of the stipulated period, will render himself liable for damages for breach of contract if he makes a disposition of his affairs which renders it impossible for him to receive the services in the manner contemplated by the contract. (Note to *Turner* v. *Sawdon & Co.,* 2 B. R. C. 774.) In every such case the question in the last analysis is simply this: Do the terms of the contract—and, if the contract is ambiguous, do the circumstances under which it was made —necessitate the implication that the employer has undertaken not to dispose of his business during a fixed period of time?

[3] As we have pointed out, any claim that appellant breached his contract necessarily must be grounded upon the theory of an implied undertaking on his part not to sell his business before the expiration of the year, there being no express agreement on his part not to do so. The question then is this: Does an agreement to hire a truck and its driver to haul lumber for a year, *as the business of the hirer warrants,* carry an implied obligation on the hirer's part that he will not during the year put it out of his power to continue furnishing lumber for hauling?

The words "as our business warrants" give to the hirer of the truck a latitude and a freedom of action and often found in contracts of employment for a definite period.

Their presence here makes this contract of employment somewhat analogous to those contracts of purchase and sale where the buyer agrees to take such an amount of goods as he may "require" in the course of his business. It seems to be generally held in actions to recover damages for the breach of such "requirement contracts," as they often are called, that if the buyer sells his business and thus reduces his requirements to the vanishing point, he does not thereby breach his contract. Thus in *Drake* v. *Vorse*, 52 Iowa, 417 [3 N. W. 465], the plaintiff, a manufacturer of castings, and the defendant, a manufacturer of school furniture, entered into a contract whereby the former was to furnish the latter with all the castings which the defendant "may want" during the year 1873. In May of that year the defendant formed a partnership with another, and thereafter the business was carried on by the firm, which refused to receive any castings from the plaintiff. It was held that the defendant had the right to discontinue his business at any time; that he did so when he formed the partnership; that the contract was not binding on the firm, and that the defendant was not liable for damages, though the plaintiff had incurred considerable expense in preparing for the manufacture of the castings and the defendant had made a general statement at the time of entering into the contract as to the amount he would probably want during the year. In that case the court says: "But, conceding that it [the contract] bound him [the defendant] to order and take of the plaintiff all the castings he should want, it could not, we think, have the effect to preclude him from entering into a partnership, nor could it become obligatory upon the firm. It was certainly the defendant's privilege to discontinue business at any time when it should appear to him that his interest demanded it, and that, too, without becoming liable to the plaintiff in damages. He did discontinue business upon his individual account. After that he did not individually want or need any castings, and as the firm was not bound to take any we do not think that the defendant became liable." The following cases are to the same effect: *McKeever Canonsburg Iron Co.* v. *McKeever*, 138 Pa. 184 [16 Atl. 97, 20 Atl. 938]; *Kanaskat L. & S. Co.* v. *Cascade Timber Co.*, 80 Wash. 561 [142 Pac. 15]; *Hamlyn & Co.* v. *Wood & Co.* [1891], 2 Q. B. 488;

*Pfann* v. *Turner etc. L. Co.*, 194 Fed. 69 [114 C. C. A. 89]. See, also, *Kenan etc.* v. *Yorkville etc. Co.*, 260 Fed. 28 [171 C. C. A. 64]. In a note to *Diamond Alkali Co.* v. *Aetna Explosives Co.*, 7 A. L. R., at page 507, the annotator, speaking of these "requirement contracts," says: "Where the buyer exercises good faith and is free from fraud in disposing of, or making a change in, his business, such change will have the effect of releasing him from the obligation of the contract to purchase his requirements of a certain commodity used in his certain business, to the extent that the change in the business does away with the necessity for the use of the commodity."

[4] But quite irrespective of whether this contract may or may not be regarded as akin to those contracts of sale where the buyer's agreement is to take such articles as the exigencies of his business may require during a fixed period of time, there are other considerations which point unerringly to the conclusion that appellant did not impliedly obligate himself not to sell his business during the one-year period. He did not bind himself to furnish respondent with any particular amount of lumber for hauling, nor did he agree to compensate respondent except for lumber hauled by the latter as and when warranted by the business. Respondent, therefore, assumed certain risks which were every whit as fatal to his right to haul lumber throughout the year as a sale of appellant's business would be. Those other risks were left altogether uncovered by the contract. They are risks against which it cannot be said that there was any protection by implication. For example, since appellant was obliged to employ the truck and its driver only so far as his "business warrants," it is clear that·if, during any part of the year, the prices of lumber had declined to a point where the business could not be carried on with profit, he could have closed his establishment and could have held his lumber for better prices, even though respondent may have been left for the better part of the year without any lumber to haul. Or appellant might have had labor troubles with his workers, such as strikes, which would have made it inexpedient for him to endeavor to move any lumber during the greater part of the year. Since risks of this character were indubitably assumed by respondent, the reasoning of the English court in *Rhodes* v. *Forwood*, 1

App. Cas. 256, 265, becomes pertinent. There Lord Cairns says: " . . . there are really in this agreement several risks which are left altogether uncovered, and as to some of which it was very candidly admitted by the counsel for the respondents that no provision whatever was made, and that they could not say that there was even by implication any protection against those risks." Then, after pointing out what these risks were, including, among others, the closing of the principal's colliery on account of low prices, strikes, etc., Lord Cairns proceeds: " . . . if . . . it could not be contended that there is any provision in this contract against any of those risks, why is it to be assumed with regard to the other, the fourth risk, namely, the risk of the colliery owner, not selling his coal elsewhere piecemeal but selling the colliery itself to a purchaser, that there is an implied undertaking against that one risk, although it is admitted that there is no undertaking at all against any of the other risks? . . . The simple point here appears to me to be, as it is admitted that there is no express contract which has been violated, can your Lordships say that there is any implied contract which has been violated? I can find none. I cannot find any implied contract that the colliery owner would not sell his colliery entire." This case was followed in *Morris* v. *Dinnick*, 25 Ont. Rep. 291, where the court says: "There is no undertaking [on the part of defendant] to manufacture any defined quantity of goods, or indeed to manufacture at all; and according to the class of cases applicable, no such term should be implied. . . . In brief, this plaintiff was to get commission on the sale of all goods manufactured by the defendants, but they did not say they would manufacture; and the continuance of the concern was, therefore, left at large to be determined by the interests of the principal."

Appellant, and not respondent, was the judge, and the sole judge, of how his lumber business should be conducted. As we have pointed out, there was no undertaking on appellant's part to furnish respondent with any definite quantity of lumber for hauling. Indeed, appellant was not bound to operate his business at all if it appeared that he could not do so except at a loss. And if he could altogether cease operating his business, he could sell it and get rid of it. Having the right to reduce his business to a minimum—and

he unquestionably did have that right, since he was the sole judge of how the business should be managed to meet the varying exigencies arising from time to time—it follows that he had the right to reduce it to nothing, so far as respondent was concerned. What was said in *In re English etc. Ins. Co.*, L. R. 5 Ch. 737, is in point. There a person entered into an agreement with an insurance company to act as the company's agent for five years at a fixed annual salary and a commission of ten per cent on the net profits of each year. Less than two years after the agreement was entered into the company was wound up voluntarily. It was held that the agent was not entitled to damages by reason of the company having put it out of his power to make profits. "I am of the opinion," says James, L. J., "that this was a contract which did not give the servant the right to determine what the extent of the business was to be. He could not call upon the directors to issue new policies, to accept new premiums, or to take new risks, if they were not minded to do it. He could not say, 'Such a person has brought in a policy of insurance, and you must accept that.' Because, if he had a right to say 'You must carry on the business,' he would also have a right to say 'You must carry on the business in the usual and proper manner,' and that would be giving a servant the right of controlling the master in the mode in which he chose to carry on his business. Now, I am quite satisfied that the meaning of the contract was nothing of the kind. It was never intended to give the servant the right of dictating as to the extent of business, whether more or less, or nothing, but he simply took the chance of the company finding it a profitable business and carrying it on. *The company had a right to reduce the business to a minimum; and if they had a right to reduce it to a minimum, they had a right to reduce it to nothing —as far as he was concerned.* [Italics ours.] I was referred to a case at Common Law, *McIntyre* v. *Belcher*, 14 Com. B. (N. S.) 654, where this illustration was given: 'If I sell a man all the apples from my apple tree, I have no right to cut down that tree.' But that is essentially different from a man saying 'I am going to buy and sell apples, and I will give you 10 per cent upon the profits of the sale of them.' That must, of course, depend upon the amount of apples which the man who enters into the specu-

lation will buy, and what price he will be able to sell them at. In such a case the other party could not say, 'You are not making profits, because you go to a wrong market and buy upon bad terms; you have not got sufficient capital, and you are selling at a loss in order to get money. Therefore I am entitled to damages for the improper mode in which you carry on your business.' "

What was said by Lord Esher in *Hamlyn & Co.* v. *Wood & Co., supra,* is pertinent here. There the defendants, who carried on business as brewers, entered into an agreement in writing by which they agreed to sell to the plaintiffs, and the plaintiffs agreed to buy, all the grain "made" by defendants from July 19, 1885, to September 30, 1895, at the average of the rates charged each year by certain specified firms. It will be noticed that the agreement was, not that defendants would sell the plaintiffs grain for ten years, but that they would sell, and the plaintiffs would buy, all grain *made* by the defendants for ten years. In 1890 the defendants sold their business, and in consequence ceased to supply grains to the plaintiffs. It was held that the contract did not contain any implied obligation on defendants' part not to prevent themselves from continuing the sale of grains to the plaintiffs for the ten-year period. In the course of his opinion Lord Esher says: "It is admitted in the present case that there has been no breach of any express stipulation of the agreement, and therefore we are asked to imply a stipulation of which there has been a breach. The stipulation we are asked to imply is, not that the defendants contracted to carry on their business for ten years, but that they contracted that they would not during that period wilfully do anything to prevent their so doing. If you cannot imply the first of these stipulations as a matter of business, I should think it would be very difficult to imply the second." So here, the terms of the contract before us do not include an implied undertaking on appellant's part to carry on his lumber business during all of the year regardless of prices, strikes, or other contingencies affecting profits. And if we cannot imply an obligation on the part of appellant to carry on his business during the year, then, as was said in substance by Lord Esher, it would be very difficult to imply that he contracted that he would not

during that period voluntarily do anything to prevent his carrying on his business.

Our conclusion from the foregoing is that the sale of appellant's business, though it put it out of his power to furnish respondent with any more lumber for hauling, did not violate any express or implied term of the contract.

None of the cases relied upon by respondent conflicts with our conclusion. In *Bagley* v. *Cohen,* 121 Cal. 604 [53 Pac. 1117], cited by respondent, the court applied to the facts the unquestionably correct doctrine that one who voluntarily puts it out of his power to do *what he has agreed to do,* breaks his contract and is immediately liable to be sued thereon for damages, even though the time specified for full performance has not arrived. There the obligor, Gould, had expressly agreed to pay out of the profits to be realized by him in his business a debt which he owed the plaintiff. The contract before the court in that case clearly showed that Gould had impliedly undertaken not voluntarily to disable himself from realizing profits in his business; for only out of such profits could the debt, a fixed and definite sum of money, be paid in the manner in which he had expressly agreed it should be paid. In every judicial controversy under a contract it, as well as the law, must be interpreted. The interpreted contract is what the law enforces. Therefore, to ascertain whether there has been a breach the agreement must first be interpreted. It of course is freely conceded by us that if appellant had expressly or impliedly obligated himself to carry on his business during all of the one-year period, in order that lumber might be furnished by him to be hauled by respondent's truck and driver, he would have been guilty of a breach of his contract. But, for the reasons which we have stated, no such obligation on appellant's part can be implied. What we have said of the Bagley case applies with equal force and for substantially the same reason to *Wolf* v. *Marsh,* 54 Cal. 228, and *Carter* v. *Rhodes,* 135 Cal. 46 [66 Pac. 985]. In the only other case cited by respondent—*Alderson* v. *Houston,* 154 Cal. 1 [96 Pac. 884]—the defendant had *expressly* agreed to do the very thing which he later put it out of his power to do. That is to say, in that case the defendant had expressly agreed to furnish certificates of title which, had they been furnished by him as he had agreed, would have shown the

properties to be clear of the assessment liens which he later permitted to accrue. There was no question there as to whether the defendant had impliedly undertaken to do that which he subsequently put it out of his power to do. Whereas in the instant case the question is, Should the court read into appellant's contract an implied undertaking to carry on his business in such a manner throughout the year that there would be deliveries of lumber to be hauled by respondent's truck and driver? We think the terms of this contract do not warrant any such implication.

The judgment is reversed.

Works, J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 29, 1926, and the following opinion then rendered thereon:

THE COURT.—The petition for rehearing is denied.

It is urged in the petition that in construing the contract we overlooked the fact that appellant received a consideration for his promise to hire respondent's truck and driver for one year. That consideration, as stated in the opinion, consisted of the purchase by respondent of the Indiana truck owned by appellant's son-in-law. This element was not overlooked by us when construing the contract in question. We thought then, as we do now, that the mere fact that appellant received a consideration for his promise is not necessarily determinative of the scope of his contractual obligations—that the receipt by him of the consideration agreed upon should not be given the force which appellant now claims for it. Obviously, in every binding contract the promise of the promisor must be supported by a legal consideration of some kind. In many of the contracts involved in actions such as this the consideration received by the defendant for his promise to employ the plaintiff is the executory promise of the latter to perform his part of the mutual covenants. And while it is true that here respondent's promise to purchase the son-in-law's truck ceased to be executory and became an executed promise when he made the purchase, it does not therefore follow, as a necessary conclusion or as a

matter of law, that appellant's agreement imports an implied obligation not to sell his business prior to the expiration of the year.

[5] If the terms of appellant's express obligations are such that an undertaking on his part not to sell his business during the year cannot be implied, then the mere fact that he received a consideration for his promise would not bind him not to sell. The consideration received by him was given in return for his promise to do something. The question therefore is: What was it that he promised to do? The nature of that promise and of the implications incident to it are not necessarily controlled by the consideration which he received. Obviously, it could not be held that appellant breached his contract if he had neglected to do something which he had not obligated himself to do, merely because he received a consideration for doing what he did agree to do; and, conversely, it cannot be held that he breached his contract if he has done something which he has not obligated himself to refrain from doing, merely because he received a consideration for doing what he agreed to do. The sole question is: What is the scope and content of appellant's obligation? In seeking the answer to this question each and every part of the agreement, including the consideration agreed to be given to appellant, its nature and its *value,* should be taken into account. But the consideration for appellant's promise is only one of the elements to be considered. There may be and, as we think, there is, another and a determining factor—one which warrants the inference that appellant did not obligate himself not to sell his business. That factor, as we pointed out in the opinion, is found in the provision that appellant agrees to hire respondent's truck and its driver only "as our business warrants."

[6] While we agree with respondent that the fact that appellant has received his consideration is an element to be considered in arriving at the intention of the parties, we do not agree with his claim that the receipt of that consideration, regardless of its nature or of its value, conclusively evidences an intention that appellant was not to sell his business during the term of the employment or hiring. We think we should take counsel of the character of the consideration and of its value. It may be that if

respondent had parted with a large pecuniary considera-
tion for the privilege of hauling the lumber for one year,
it should in that case be held that it was the intention
of the parties that appellant was not to discontinue his
business within the year, because of the great hardship
which would befall respondent if he should lose the oppor-
tunity to haul the lumber for the full period agreed upon,
after having paid dearly for the privilege. But here, in
view of the nature of the consideration received by appel-
lant, the hardship would fall upon the latter if an implied
obligation not to sell the business were imported into the
contract. It may be presumed that the truck which re-
spondent purchased from appellant's son-in-law had some
value, and that respondent, when he purchased it, received
value for his money. Indeed, if we may assume that
respondent exercised ordinary business prudence in the
purchase of the truck it may be inferred that in the vehicle
itself he received full value for the money paid by him
for it. Unless, therefore, the other terms of the contract
warrant the court in spelling out or implying a covenant
on appellant's part not to sell his business, we would not
be warranted in holding that an agreement not to sell
should be imported into the contract merely because re-
spondent bought a truck at appellant's request. In such
a transaction appellant receives nothing of any substantial
pecuniary value. "A right so important as that of one
to sell his own property," says the court in *Pfann & Co.*
v. *Turner Cypress L. Co.*, 194 Fed. 69 (cited in the opin-
ion), "should not be denied him unless the language em-
ployed clearly conveys that intention."

What we have said is not without support in the decisions
of other courts. Thus in *Kanaskat Lumber etc. Co.* v.
*Cascade Timber Co.*, 80 Wash. 561 (cited in the opinion),
defendant agreed to sell to plaintiff's assignor—whom for
brevity we shall refer to as the plaintiff—all logs cut by it.
At the same time plaintiff undertook, as a part of the con-
sideration moving to the defendant, to erect and maintain
a shingle-mill adjacent to defendant's railroad tracks.
This executory promise to erect a shingle-mill must have
become an executed promise long before the expiration of
the ten-year period mentioned in the contract, for the
opinion states that for six years there was a mutual per-

formance of the contract by the parties thereto. The court held that the defendant was not liable in damages in consequence of its failure to continue to deliver logs, for the reason that its obligation under the contract was no more than a promise to deliver such logs as it might cut while in pursuit of its own logging operations. In the course of its opinion the court says: "We need go no further than the contract. Its terms do not warrant us in holding that respondent is bound to deliver except as it conducts its own logging operations. A contract to so deliver, on the one hand, and a contract to build a mill at a certain place and take the logs under such conditions as are stipulated in the contract is not in contravention of any public policy, nor can we say, as a matter of law, that it involves a hardship, and would not have been entered into had appellant appreciated the force of the language employed. We would have the same right to imply into the contract an understanding that appellant was mindful of the fact that the business of logging is in a sense uncertain and subject to market fluctuations, and that a logger would not bind himself to deliver excepting as he could operate at a profit, as we would have to imply that appellant would not have entered into the contract unless upon an understanding that respondent would keep it in material for the continuous operation of its mill. To so imply would lead us into difficulties which could not be measured by any rule. . . . Counsel puts great reliance upon the words 'the party of the second part [plaintiff] agrees to *erect and keep said mill* adjacent to the track of the first party.' They ask: Why was appellant thus bound if respondent could log and deliver at will? Appellant [evidently the court intended to say respondent] meets this argument, saying that it is no more than a stipulation to protect it from a call to deliver at some point away from its own tracks. *Another answer might be that the words relied on are not to be singled out as the essence of the contract, but they are to be construed along with the agreement to deliver cedar logs 'as they are reached in logging operations of the party of the first part.'* " (Italics ours.)

[7] It is further claimed in the petition for rehearing that respondent, as a reasonable man, could not have intended

that appellant, in the short space of three months, should put it out of his power to furnish lumber for hauling. It is said that a construction of the contract which might lead to such a result would place respondent at the mercy of appellant. It may have been respondent's expectation that the business would be carried on by appellant throughout the year; but even so, he cannot complain if he entered into a contract which did not obligate appellant to refrain from frustrating that expectation. What was said by the New York court of appeals in *Jugla* v. *Trouttet,* 120 N. Y. 21, is pertinent. There the plaintiffs, glove manufacturers in Paris, sold to defendant their New York business, at the same time agreeing to furnish him with gloves manufactured by them so long as he should continue the business so purchased. This provision of the contract was a part of the consideration moving to the defendant for the total sum which he agreed to pay to plaintiffs upon his purchase of their business. About a year after the contract was entered into plaintiffs discontinued the manufacture of gloves. Meanwhile they had been paid a considerable part of the purchase price. The action was brought by plaintiffs to recover the balance due them on the purchase price. Defendant claimed that plaintiffs had undertaken to continue to manufacture gloves and to furnish him with them for his trade, and that when they ceased to manufacture any more gloves they were chargeable with a breach of the contract. It was held that plaintiffs' undertaking to furnish gloves to defendant was dependent upon their continuing to manufacture them. In the course of its opinion the court says: "The terms of the agreement fairly import the intent of the parties, which is deemed within its covenants, that, so long as the defendant should continue the business so purchased by him of the plaintiffs, the latter should sell to him, and he should purchase of them, gloves for his trade, provided the plaintiffs continued to manufacture gloves. This qualification quite clearly appears by the provisions of the contract, and there is no opportunity to spell out or imply a covenant on the part of the plaintiffs to continue in the business of manufacturing, or which denied to them the right at their pleasure to discontinue the production of gloves. It may have been assumed by the parties that the making of gloves, and the

sale to and purchase by the defendant, would be continued
as long as the latter desired to carry on, in New York,
the business so purchased by him, and that such expectation
on his part was a leading inducement to him to make the
purchase.. It is in that view that the defendant's counsel
urges that the intent to accomplish such purpose should
be treated as within the covenants, and that any other
view would render the contract unreasonable, and place him
at the mercy of the plaintiffs. . . . In the present case
the contract appears to have been carefully prepared, its
provisions are without doubtful import, and, although the
defendant took by his purchase the good-will of the busi-
ness, one essential element of which may have been the
reputation of the 'D. Jugla' gloves, the undertaking of the
plaintiffs to furnish them to the defendant was plainly
made dependent upon their continuance to manufacture
them, and such was manifestly the qualification of their
covenant in that respect.''

In his petition for a rehearing respondent calls attention
to certain authorities which, like some of those cited in his
brief, are cases where the defendant, being indebted to
the plaintiff, promised to pay his debt out of profits to
be realized by him in some business venture. In that class
of cases the defendant owes a debt which he must pay.
He makes a contract which accords him the privilege of
paying his debt in a certain way; but pay the debt in
some manner he must. If he pays it out of the profits as
he agreed to, well and good; if he does not pay his debt
in the manner agreed upon—if he sells the business so that
he cannot pay the debt as contemplated by his contract—
then he must be made to pay it out of any assets which
can be reached on execution. The debt is his, and he cannot
escape paying it in some manner. Obviously those cases
have no application here.

Finally, our attention is called to certain cases which
respondent claims give to the so-called ''requirement con-
tracts'' a construction different from that which is given
them in the cases cited by us in the opinion filed herein.
It is possible that the decisions which deal with that class
of contracts are not in entire harmony. But whether the
decisions which have construed such contracts are or are
not in accord is immaterial here. For, as is said in the

opinion, quite irrespective of whether this contract is or is not analogous to the so-called "requirement contracts," there are other reasons, detailed in the opinion, which lead to the conclusion that appellant's contract did not imply an obligation not to sell his business.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 28, 1926.