[Civ. No. 12464.  First Dist., Div. Two.  Jan. 26, 1944.]

M. GASPAR, Respondent, v. UNITED MILK PRODUCERS OF CALIFORNIA (a Corporation), Appellant.

Hardin, Rank, Meltzer & Fletcher, Decoto, Hardin & Rank and Carleton L. Rank for Appellant.

Raymond Salisbury for Respondent.

DOOLING, J. pro tem.—Defendant appeals from a judgment in favor of plaintiff in an action upon a contract in which defendant agreed to purchase from plaintiff at a minimum price of $10 per share not to exceed 413 shares of the capital stock of Dariglen Creameries, Ltd., in the event plaintiff within seven years shall "be discharged from those duties which he is now performing for said corporation, save and except his duties now performed by him as president of said corporation or as an official thereof."

Dariglen Creameries, Ltd. was a corporation engaged in the bottling and sale of milk. Defendant is a nonprofit corporation whose members are producers of milk and is engaged in the handling and sale of such milk to distributors thereof. In 1934 Dariglen Creameries, Ltd. was indebted to Cooperative Dairymen's League for milk purchased from it in the sum of approximately $47,000. This creditor made an offer to Dariglen Creameries, Ltd. to compromise its claim for $11,340 in cash and approximately $8,000 to be evidenced by a promissory note, payable in instalments.

Plaintiff, who was president of Dariglen Creameries, Ltd., and one Manuel Soares, its manager, negotiated with defendant and as the outcome of such negotiations defendant agreed to purchase 2,130 shares of the capital stock of Dariglen Creameries, Ltd., for $21,300, $11,340 in cash and the balance evidenced by defendant's promissory note. As a condition of such purchase, and to give defendant control of

Dariglen Creameries, Ltd., it was further agreed that defendant should have the right to elect a majority of the trustees under a voting trust agreement which would result in defendant having a majority of the board of directors of the corporation. The 2,130 shares of Dariglen Creameries, Ltd., was to be secured, and was actually secured, by the getting of assignments of unpaid stock subscription agreements. The $11,340 so paid in cash was used by Dariglen Creameries, Ltd., to effect the compromise of its debt to Cooperative Dairymen's League.

Dariglen Creameries, Ltd., in 1940 was operating at a loss, the monthly indebtedness amounting on the average to more than $2,000 in excess of monthly receipts, and the Director of Agriculture had cited Dariglen Creameries, Ltd., to show cause why its license should not be revoked for failure to pay producers for milk delivered. In this condition of affairs a contract was entered into with defendant whereby all of the assets and property, including business and good will, of Dariglen Creameries, Ltd., were transferred to defendant and defendant assumed all of its liabilities. This transfer was effected on July 26, 1940. On August 1, 1940, defendant in turn sold and transferred to the Borden Company the trade routes, business, good will and certain of the physical assets of Dariglen Creameries, Ltd., and from that date the operation of any business at the plant of Dariglen Creameries, Ltd., was completely discontinued.

On August 3, 1940, plaintiff made a tender of 413 shares of the stock of Dariglen Creameries, Ltd., to defendant and demanded payment by it of $4,130 therefor. This demand was refused and the action which resulted in the judgment appealed from followed.

The trial court found "that on or about the 26th day of July, 1940, said Dariglen Creameries, Ltd., ceased to transact the business previously carried on by it and upon said date the employment of said plaintiff herein by Dariglen Creameries, Ltd., ceased and terminated; that said plaintiff was discharged from further employment by Dariglen Creameries, Ltd., and ceased to perform each and every duty which he had been previously performing for said corporation. . . ." This finding of plaintiff's discharge is attacked by defendant as unsupported by the evidence, appellant claiming that to constitute a discharge from employment "there must be un-

equivocal statements by an authorized person to that effect.''

On July 26, 1940, Dariglen Creameries, Ltd., having transferred all of its assets including its business to defendant, had thereby not only put it entirely out of its power to employ plaintiff further to perform any of the duties which he had theretofore performed for it in its business, but because of the transfer of all of its assets it was also no longer in a position to pay him his agreed salary. It is difficult to imagine how any mere statement of discharge, however unequivocal, could have made the termination of his employment any more complete.

In 1 Labatt's Master and Servant, 2d ed., sec. 187 c(4), pp. 589-590, it is stated that a servant is dismissed:

''Where the master by some positive act rendered it impossible for the servant to accomplish the stipulated work. The most numerous and important examples of this situation are furnished by the cases which involve a discontinuance of business by the master.''

In the same work, vol. 1, sec. 262b, p. 795, we find the following:

''It is fully settled that a servant engaged for a definite term, to perform duties with relation to a certain business, is entitled to maintain an action for wrongful dismissal against his master, if the fulfilment of the contract is rendered impossible by the discontinuance of the business before the expiration of the stipulated term.''

The precise question was recently considered by the Supreme Court of Minnesota in *Matthews* v. *Minnesota Tribune Co.*, 215 Minn. 369 [10 N.W.2d 230]. In that case the defendant, publisher of a newspaper, sold the newspaper and plaintiffs, theretofore employed on the newspaper, sued for wrongful discharge. The court said at page 232 [10 N.W.2d] ;

''When an employer disposes of his business, does it operate as a discharge of his employes? The authorities are almost unanimous that it does, principally for the reason that the employer is no longer able to perform his part of the bargain. The question is usually presented in cases involving suits by the employe for breach of a contract of employment for a definite time. Such a case was *White* v. *Lumiere N. A. Co., Ltd.*, 79 Vt. 206, 64 A. 1121, 6 L.R.A.N.S. 807, where the employer leased his business for a term exceeding the duration of the employment contract, and it was held that the employe was dismissed and entitled to sue for its breach.

*Globe & Rutgers Fire Ins. Co.* v. *Jones,* 129 Mich. 664, 89 N.W. [580] 581, is much in point. There it was held that the consolidation of two insurance companies operated as a breach of the employment contract between one of the companies and its agent, the court saying: 'He (the employe) has a right to say for whom he will work, and under a contract to work for one company he cannot be required to work for an entirely different company.' "

█ Appellant insists that the California cases announce a different rule. An examination of the cases does not bear out this contention. In *Langenberg* v. *Guy,* 77 Cal.App. 664 at p. 668 [247 P. 621], it is said that "it must be conceded that where a party to a contract of employment obligates himself by either an express or an implied agreement not to disable himself from continuing the employment for a stipulated time, he will make himself liable in damages for breach of contract if, by a sale of his business before the expiration of the stipulated period, he voluntarily puts it out of his power to continue the employment to the end of its term in the manner agreed to by him."

In the Langenberg case the agreement was to employ plaintiff for one year to haul lumber "as the business of hirer warrants" and the court held that the quoted words "give to the hirer of the truck a latitude and freedom of action not often found in contracts of employment for a definite period." The court concluded that under the peculiar language of the contract there was no absolute duty to continue in business for the term of one year, but only to give plaintiff such hauling business, if any, as the employer might have during that period. The language of the contract in the case before us on the other hand, imposing on defendant, as it does, the duty to buy plaintiff's stock if he is "discharged from those duties which he is now performing," contemplates his continuance in the performance of those duties and implies an agreement that the employer shall continue in business so as to furnish such employment during the entire seven year period covered by the contract.

The general rule, as above stated, was again recognized in *Armstrong* v. *Cherry,* 89 Cal.App. 442, the court saying at p. 444 [264 P. 798] :

"It is a rule, universally recognized, that while a master may not close out his business without becoming liable in damages to an employee under a contract of employment for

a specific term, still an immaterial change gives no cause of action for damages where there is otherwise no change in the manner of conducting the business and the employer continues in a way to be the real owner.''

In that case an employer father had ''turned the business over to his sons'' because of ill health and the court held that the case fell outside the general rule because the trial court had found that the employee ''after knowledge of the change in the business, voluntarily continued his employment with the sons at an increased wage . . .'' (89 Cal.App. p. 444) and the appellate court determined that this finding was supported by the evidence (89 Cal.App. p. 445). The basis of the decision was that plaintiff ''willingly continued in his employment under the new arrangement, and accepted the sons as his employers in the place of the father.'' (89 Cal. App. p. 445.)

*Percival* v. *National Drama Corp.*, 181 Cal. 631 [185 P. 972], most strongly relied upon by appellant, is readily distinguishable on its peculiar facts. There the plaintiff was employed by a motion picture production company which was not currently producing any pictures to render to it ''such services as may be required of him'' from April 21, 1916, to September 1, 1917. The court said at page 638:

''Plaintiff lays some stress, in his argument, on the fact that defendant closed up its plant at Los Angeles and went out of business. But this occurred a long time before the alleged discharge. Defendant was practically out of business when the contract was made, and plaintiff undoubtedly entered into it knowing that defendant would have little, if anything, for him to do unless, and until, it should resume production.''

In *Stone* v. *Bancroft*, 112 Cal. 652 [44 P. 1069] and *Stone* v. *Bancroft*, 139 Cal. 78 [70 P. 1017, 72 P. 717], both cases involving the same contract of employment for a ten year period, the employer continued in business but the employee although ready and able to perform his duties did not do so because none were required of him by the employer. The Supreme Court said, 112 Cal. p. 658:

''Bancroft was president of the corporation, and it is evident that neither he, nor the History Company, wanted the plaintiff to assist in the conduct of the business. At the same time plaintiff was not discharged, and there is evidence in the record to indicate that the intention of Bancroft was

not to discharge him, but rather to make his position as an employee so unpleasant and disagreeable as to cause him to withdraw from the contract under which he began his labors."

These cases on the facts are not in point on the question here presented.

In the early case of *Webster* v. *Wade,* 19 Cal. 291 [79 Am. Dec. 218], the plaintiff was employed to serve as steward on a boat for one year. During parts of the years the boat was laid up. It appears from the statement of facts that: "During this interval, defendant neither notified Collins that he, defendant, should employ him no longer, nor in any manner discharged him from the contract, but on the contrary, spoke of and recognized Collins as his employe." The case, in any event, can be of little weight, since as noted in *Stone* v. *Bancroft, supra,* 112 Cal. 652 at pp. 657-8:

"It was further said in that case that a discharge of the employee without cause did not defeat an action upon the contract. But it would seem that in later years the true rule has been recognized to be that an action in damages for the breach is the proper remedy in such a case."

*Winsor* v. *Silica Brick Co.,* 31 Cal.App. 85 [159 P. 877] and *Palmer* v. *Harlow,* 52 Cal.App. 758 [199 P. 844], also cited by appellant, in no wise deal with the question whether an employee is discharged by the employer's disabling himself from the performance of the contract by the sale of his entire business.

No California case which we have found announces a rule contrary to the rule generally recognized that where an employer puts out of his power the further performance of an employment contract by selling his entire business it operates as a discharge of his employee engaged in such business. On the contrary this rule is recognized in *Langenberg* v. *Guy, supra,* 77 Cal.App. 664 and *Armstrong* v. *Cherry, supra,* 89 Cal.App. 442, although on their facts the courts held that it was not applicable in the cases before them.

We are satisfied that the finding of plaintiff's discharge by reason of the sale of its entire business by Dariglen Creameries, Ltd., is supported in fact and in law.

The contract sued upon contained the following provision:

"Or, in the event said Dariglen Creameries, Ltd. shall become bankrupt and said second party shall lose his posi-

tion by reason of such bankruptcy, then such obligation to purchase said stock shall cease and terminate.''

Defendant pleaded as an affirmative defense that on and prior to July 26, 1940, Dariglen Creameries, Ltd. had become and was bankrupt. The trial court found against this defense and this finding is attacked.

Much of the briefs is taken up with a discussion of the meaning of the words "become bankrupt" and "bankruptcy" as used in this contract. If the words "bankrupt" and "bankruptcy" are to be construed in their technical sense the finding that Dariglen Creameries, Ltd. did not become bankrupt is admittedly correct. It was neither adjudicated a bankrupt nor did it commit any of the acts of bankruptcy enumerated in the National Bankruptcy Act. "A person is a bankrupt within the meaning of the federal statute only when he has been guilty of one or another of the forbidden acts whose commission stamp him as a bankrupt." (*Continental B. & L. Assn.* v. *Superior Court,* 163 Cal. 579, 583 [126 P. 476].)

Appellant argues that "bankrupt" and "bankruptcy" as used in this contract should be construed as synonymous with "insolvent" and "insolvency." If this be conceded we are confronted with the further fact that the words "insolvent" and "insolvency" are themselves used with at least two meanings.

"Insolvency, in its popular and general sense, is used to denominate the insufficiency of the entire property and assets of an individual to pay his debts." (*Estate of Boggs,* 19 Cal.2d 324, 329 [121 P.2d 678].) This is the sense in which the term "insolvency" is used in the National Bankruptcy Act (8 C.J.S. 487-8) and in the Uniform Fraudulent Conveyance Act (Civ.Code, sec. 3439.02) and this is the meaning generally ascribed to the term in cases involving fraudulent conveyances independent of the statute. (37 C.J.S. 945.)

On the other hand decisions may be found holding that a debtor is insolvent, even though the present fair salable value of his assets exceeds the amount of his debts, "when he is unable to pay his debts from his own means as they become due." (*Alpha H. & S. Co.* v. *Ruby Mines Co.,* 97 Cal.App. 508, 515 [275 P. 984].) Occasionally the two definitions are used interchangeably in the same opinion with-

out any apparent realization that there may be a distinction between them. (*Cf. Cain* v. *Richmond,* 126 Cal.App. 254, 259 [14 P.2d 546].)

This confusion in the meaning to be given to the term "insolvency" was one of the reasons for the drafting of the Uniform Fraudulent Conveyance Act. (See Commissioners' Prefatory Note, 9 Uniform Laws Annot. 326.)

If we concede that the words "bankrupt" and "bankruptcy" as used in the contract should be held synonymous with "insolvent" and "insolvency" we are convinced that the meaning of those words should not be extended beyond their popular and general sense as defined in *Estate of Boggs, supra,* 19 Cal.2d 324, 329. The words of a contract are generally to be understood in their ordinary and popular sense, unless used by the parties in a technical sense. (Civ. Code, sec. 1644.) If used in a technical sense the words "bankrupt" and "bankruptcy" must be defined by reference to the National Bankruptcy Act. If used in a popular sense as meaning "insolvent" and "insolvency," the popular and general definition of insolvency must be adopted, rather than another, and strictly legal, meaning.

The burden was on defendant to prove its defense of the bankruptcy of Dariglen Creameries, Ltd. It made no proof of the value of the portion of the properties sold by it to the Borden Company, other than the price paid by the Borden Company for such property. In addition to the cash paid by the Borden Company a further consideration for the transfer to it of this property was the purchaser's agreement to handle appellant's milk on certain terms for a fixed period of time. No attempt was made to prove the value of this agreement to appellant, or the value that it was believed to have by appellant at the time. Even if the sale price to the Borden Company, if measured solely in money, would be competent to prove the value of the property sold, a matter at least open to considerable doubt (see *Merchants Trust Co.* v. *Hopkins,* 103 Cal.App. 473 [284 P. 1072] and the cases cited and discussed at pp. 478-9), when a part of the consideration for the property sold is an agreement to perform services, the sale price obviously cannot possibly furnish any evidence of value unless the value of the services to be performed is proved in some manner. The book value of the assets of Dariglen Creameries, Ltd. after deducting

depreciation, substantially exceeded its liabilities. The trial judge was justified in the state of the proof in finding against the defense of bankruptcy, even if that word was to be construed as synonymous with insolvency in the popular and general sense.

Appellant further argues that the evidence shows without contradiction that the contract here sued upon was obtained by duress. This defense arises by reason of the fact that the $11,340 in cash was advanced by appellant to Dariglen Creameries, Ltd. on an oral understanding that the shares of stock would be transferred to appellant and the voting trust agreement effectuated at a later time. When this time arrived respondent refused to sign the voting trust agreement unless appellant would execute the contract here in suit, claiming that appellant had agreed to do so at the time of the original negotiations. Two witnesses testified regarding this occurrence, one the secretary and the other the manager of appellant. From their testimony it appears that a dispute arose between the directors of appellant and the respondent, as to whether the directors had orally agreed to sign the contract to purchase respondent's stock in case of his discharge, respondent insisting that they had and the directors claiming that they had not done so. Both witnesses testified that they had not known of any such oral agreement at the time of the original negotiations, but the secretary testified that he was in and out of the meeting and did not hear all that took place and the manager's testimony was not positive, but qualified as to his recollection. In answer to the direct question whether anything had been said about respondent's employment being guaranteed by appellant, his answer was: "Not to my recollection at that time." None of the directors was called to testify to what had taken place. In this state of the evidence we cannot hold that the trial court committed error in finding against the defense of duress.

Appellant also claims that the original stock purchase was induced by fraud in that, without disclosing that fact, Soares and the respondent Gaspar assigned subscriptions of their own to make up the total number of shares purchased by appellant and Soares took a brokerage commission on the sales which he divided with respondent.

Under the Corporation Commissioner's permit Soares was

entitled to a commission at the time the stock was paid for on the sales to all subscribers whose subscriptions were assigned to appellant and it is not claimed that any representation that there would be no commission was made; and the manager testified: "No, we didn't inquire about the stock whatsoever, where the stock was coming from." In answer to a question whether the directors of appellant would have entered into the transaction if they had known these facts the following testimony was given:

"A. I don't think they would.

"The Court: Q. But you don't know, do you?

"A. No."

It appears clear that neither actionable fraud nor inducement was proved.

The tender of the 413 shares is attacked on various grounds. As to 241 shares the tender was of that number of shares in a voting trust agreement which had been set up at the insistence of the lender at a time when Dariglen Creameries, Ltd. borrowed a substantial sum of money. This voting trust was created after appellant controlled the corporation and appellant's manager testified that appellant guaranteed the debt and as a condition to that guarantee required that the stock be placed in this voting trust. Respondent testified that he placed his stock in the voting trust at the suggestion of appellant. Having required respondent to put his stock into the voting trust appellant is in no position to object to the tender of the stock subject to the trust.

A portion of the tender was a certificate for 78 shares acquired in the following manner: When the balance of any partially paid subscription which was assigned to appellant was paid by it a certificate for the number of shares paid for by the original subscriber was issued to him and a certificate for the number of shares paid for by appellant was issued to it. In some cases the original subscribers had paid amounts which would call for a certain number of shares plus a fraction of a share. No fractional shares were issued in such cases, and the stock records show that the total of such fractions amounted to 156 shares, 78 of which were issued to Soares and 78 to respondent Gaspar. Respondent testified that this transaction was handled entirely by Soares and that he knew nothing about it. Neither Soares nor any of the subscribers involved was called as a witness. We can-

not assume wrongdoing in the absence of proof, the presumption being that Soares acquired their fractional shares from the subscribers in some legitimate manner. (Code Civ. Proc., sec. 1963, subds. 1, 19).

A certificate for 76 shares included in the tender represented stock received by respondent as a result of appellant paying the balance due on respondent's assigned subscription. We have already held that appellant's claim that this transaction was tainted with fraud is not supported by the evidence.

█ It is finally argued that respondent's discharge was justified by his misconduct. This argument is based on two grounds: 1. That respondent collected $650 over a period of four or five months on their stock subscriptions from employee subscribers which he did not pay over to Dariglen Creameries, Inc. until July 26, 1940, the day on which, appellant took over the business. Respondent's explanation of this is that he held the money out to pay back to the subscribers in case a rumored sale to the Borden Company should be made. In any event he did pay the money to Dariglen Creameries, Ltd. and the trial court was entitled to conclude that he acted in good faith and that there was nothing in this transaction to support a finding of misconduct justifying his discharge.

2. One Almada, an employee of Dariglen Creameries, Ltd. testified that in order to get back his position after a lay-off respondent insisted that he complete the payments on his father's stock subscription and that instead respondent issued to Almada stock owned by himself. Respondent testified that Soares handled all stock sales, that respondent did not deal personally with Almada and knew nothing of the transaction except that Soares sold some of respondent's stock for him after the corporation had no more stock to sell. This conflict was resolved in favor of respondent by the trial court, and we cannot reweigh the evidence here.

We find no error in the record and the judgment is therefore affirmed.

Nourse, P. J., and Spence, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 23, 1944.