[Civ. No. 49742. Second Dist., Div. Five. May 20, 1977.]

O. MILLER ASSOCIATES, Plaintiff and Appellant, v.
GCA CORPORATION, Defendant and Respondent.

COUNSEL

Frank J. Kanne, Jr., for Plaintiff and Appellant.

Greenberg, Bernhard, Weiss & Karma and Herbert A. Bernhard for Defendant and Respondent.

## OPINION

**ASHBY, J.**—Defendant GCA Corporation, whose Markite Division manufactured potentiometers (a technical instrument used in the aerospace industry), terminated its contract engaging plaintiff O. Miller Associates as its exclusive sales representative. Plaintiff brought this action for breach of contract. In a nonjury trial, the court found in favor of defendant and adjudged that plaintiff take nothing by its complaint. Plaintiff appeals.

The contract between the parties is embodied in a five-page typewritten agreement dated April 23, 1956.[1]

---

[1] The 1956 agreement was actually between two predecessor corporations, Miller-Joyce, Inc., and Markite Corporation. Markite became a division of GCA in 1971. For convenience we shall refer to the parties simply as plaintiff and defendant.

The agreement, in the form of an offer by defendant which was accepted by plaintiff, provides that defendant engages plaintiff as its exclusive representative in California and Oregon for sales promotion of potentiometers. (¶ 2 of the agreement.) "However, you [plaintiff] are not authorized to accept the order, nor to make any contract on behalf of [defendant]. Any order solicited, tendered to you, or otherwise obtained by you shall be forwarded to us for acceptance. All orders are subject to our final written acceptance . . . and absolute right to refuse acceptance of orders is reserved." (¶ 4.)

Defendant is to pay plaintiff a specified commission "[o]n all orders for potentiometers received from your territory that are accepted, manufactured, and billed during the period this agreement is in force." (¶ 6.) Commissions were paid during the month following shipment. (¶ 7.)

After an initial period not relevant here, the term of the agreement is annual, in the absence of a written extension or written notice of termination. (¶ 15.)

The crucial termination clause (¶ 15) which is in dispute here provides: "If this contract is not cancelled by May 4, 1956, then it is understood we [defendant] may terminate this contract at any time after December 1, 1956, by sixty day registered airmail notice to your company. (Said sixty day notice period shall hereinafter sometimes be referred to as 'the sixty day period'.) If such notice is given by us, you may still, if you desire, continue your promotion on our behalf during said 'sixty day period', but thereafter you shall cease such promotion. You shall be entitled to your commissions on orders placed to the end of said 'sixty day period' and for a period of six months (hereinafter sometimes referred to as 'the six months period') after the expiration of said 'sixty day period'; that is to say, for sixty days and six months from the date of the notice of termination, but not with respect to any orders placed thereafter. This understanding with respect to said 'six months period' is subject to the following limitation: [¶] If at the end of the first year of operation under this agreement orders placed have not reached $100,000.00, we can then give you the sixty day notice of termination, but our obligation in such event for commissions for orders placed will apply only to the end of the 'sixty day period' and will not apply beyond the expiration of said sixty days. By 'orders placed' as used in this paragraph and elsewhere, is meant orders which are dated by the customer within the particular period referred to regardless as to the date when said orders are accepted by us or invoiced."

Plaintiff's president, Owens Miller, testified as to the background and purpose of this provision. Because of the sophistication of the product and the nature of the aerospace industry, there would be a substantial length of time between plaintiff's expensive promotional effort, and the subsequent decision by the customer to buy, the production of the instrument to the customer's specifications, the shipment of the product, and the payment of plaintiff's commission. The long-term cancellation clause, which was customary in plaintiff's contracts, was intended to enable plaintiff to recoup its startup costs in light of the substantial lead time between plaintiff's promotional activities and the payment of the commission.[2]

On October 20, 1972, defendant sold the assets of its Markite Division to Litton Systems, Inc. By letter dated October 23, 1972, defendant wrote to plaintiff: "Reference my TWX under this date, on October 20, 1972 GCA sold the principal assets of its Markite Division. Therefore, in accordance with the termination clause of our agreement with you dated April 23, 1956, please be advised that we are terminating said agreement effective as of the aforementioned date."[3]

For a period of time after October 20, 1972, defendant continued to fill orders that had previously been placed with its Markite Division, but only to the extent of work then in progress. Defendant did not accept any new orders for potentiometers nor did it manufacture or bill for any new orders received subsequent to October 20, 1972.[4] Plaintiff did not place any orders with or render any services to defendant after October 20, 1972.

The trial court found that defendant had not breached the agreement, that plaintiff was fully and fairly compensated for all services rendered to defendant prior to October 20, 1972, and that plaintiff had not been damaged. ■ However, where the issue does not turn upon the credibility of extrinsic evidence or require resolution of a conflict in the evidence, the interpretation of a written instrument is a question of law, and the trial court's determination is not binding upon the appellate

[2] "The reason being primarily that we need to have some way of getting our initial investment back. We also need to be protected in the event of sale or in the event of the death of the person who understands what we have done in introducing the company."

[3] There is no suggestion that defendant's sale of its business was not in good faith.

[4] Sales in plaintiff's territory had reached over $2 million per year.

court. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Dodge,* 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].)[5]

## DISCUSSION

■■■ Plaintiff contends that defendant breached the agreement by (1) failing to give 60 days' notice of termination and (2) selling the assets of the Markite Division so as to preclude the acceptance of any further orders, and that plaintiff is entitled to damages for the breach. Defendant contends that there was no breach because it was not required to accept any orders solicited by plaintiff and had the right to sell its business without incurring any liability to plaintiff.

In our view the two crucial questions are: 1. What was the extent of defendant's obligation under the contract to pay commissions to plaintiff? 2. How did the sale of the business affect that obligation? Thus, in order to analyze the effect of the sale of the business, we must first consider what defendant's obligation would have been had it terminated plaintiff and remained in business.

Both the wording of the termination clause and Mr. Miller's uncontradicted testimony as to its purpose are consistent. In these provisions the parties recognized that there was a substantial lead time between plaintiff's promotional efforts and the subsequent placing of an order by the customer. Therefore, the parties provided that even after termination and plaintiff's cessation of promotional efforts,[6] plaintiff would nevertheless be entitled to commissions on all orders placed[7] within a period of 60 days plus 6 months from the date of notice of termination.[8]

[5]We not regard *Geffen* v. *Moss,* 53 Cal.App.3d 215, 223-224 [125 Cal.Rptr. 687], cited by defendant, as applying a different rule.

[6]It was optional with plaintiff whether to continue promotion during the 60-day period. After 60 days plaintiff was not authorized to continue promotion.

[7]"Orders placed" is defined in the agreement as "orders which are dated by the customer within the particular period referred to regardless as to the date when said orders are accepted by us or invoiced."

[8]Plaintiff could not, however, sell potentiometers for a competitor of defendant's, without foregoing some of these commissions. Paragraph 21 of the agreement provides: "Neither you nor any of your related companies are directly or indirectly to solicit or sell any potentiometer other than ours. This restriction is to apply during the term of this agreement, and during the 'six months period'; provided, however, that in the event you sell or solicit any potentiometer other than ours during said 'six months period', you shall forego commissions on all unshipped orders placed within the said 'six months period'. You shall, however, be entitled to commissions on all orders placed prior to said 'six months period'. You shall at all times keep us informed of all firms which you represent."

Therefore, in the absence of the sale of the business, plaintiff would have been entitled to commissions on all orders placed within a period of 60 days plus 6 months after the notice of termination, and subsequently accepted by defendant (regardless of the date of such acceptance, see fn. 7, *ante*), unless plaintiff engaged in competitive activity (see fn. 8, *ante*).

With this understanding we can now examine the effect of the sale of the business on these obligations of defendant.[9] No one questions, of course, defendant's "right to sell its business," but the issue is whether defendant could do so without incurring any liability for breach of its contract with plaintiff. (*Silva* v. *McCoy,* 259 Cal.App.2d 256, 259 [66 Cal.Rptr. 364].) McCoy had contracted to employ Silva as a motel manager for a year at a specified salary and bonus. After about five months, McCoy leased the premises to another and terminated the contract. The court held in favor of Silva, stating, ". . . Abell and McCoy could sell, transfer, assign, or lease the motel without restriction, but such transfer of interest did not extinguish their obligations to Silva under the contract." (*Id.,* at p. 259.)

The governing principles are well stated in the leading case of *Langenberg* v. *Guy,* 77 Cal.App. 664, 668 [247 P. 621]: ". . . For of course it must be conceded that where a party to a contract of employment obligates himself by either an express or an implied agreement not to disable himself from continuing the employment for a stipulated time, he will make himself liable in damages for breach of contract if, by a sale of his business before the expiration of the stipulated period, he voluntarily puts it out of his power to continue the employment to the end of its term in the manner agreed to by him. It may also be conceded that, in the absence of some provision in a contract of employment which tends to negative the implication that the employment will continue uninterruptedly during a specified term, one who has bound himself to employ another during a definite time for a compensation, the amount whereof can be earned and determined only by an actual performance of the services over the whole of the stipulated period, will render himself liable for damages for breach of contract if he makes a disposition of his affairs which renders it impossible for him to receive the services in the manner contemplated by the contract. In every such case the question in the last analysis is simply this: Do the terms of the contract—and, if the

---

[9]Thus we do not agree with defendant's contention that the only "breach" in this case is the failure to give 60 days' notice and that plaintiff's damages do not flow from this breach but from the sale of the business. The relevant breach is the failure to pay commissions which were promised to plaintiff in the termination clause, and the issue is the effect of the sale on these obligations.

contract is ambiguous, do the circumstances under which it was made—necessitate the implication that the employer had undertaken not to dispose of his business during a fixed period of time?" (Citations omitted.)

The answer to the question posed in *Langenberg* necessarily varies with the circumstances of each case, and, as with the analogous problem of "requirements" contracts, the cases have not always yielded consistent results where the parties have failed to negotiate a specific clause to deal with the termination problem. (See Annot., 19 A.L.R.3d 196; Note (1954) 102 U.Pa.L.Rev. 654, 659-660; Note (1965) 78 Harv.L.Rev. 1212, 1221.) In our opinion the terms of the contract in this case and the circumstances under which it was negotiated do necessitate the implication that defendant could not, by selling its business prior to the 60-day plus 6-month period, deprive plaintiff of the commissions to which plaintiff otherwise would have been entitled.

Here the parties negotiated a specific provision which was intended to protect plaintiff's rights for a designated period after a termination, and which recognized that customers may place their orders a substantial length of time after the bulk of plaintiff's efforts. Under these circumstances a forfeiture would result and plaintiff would be deprived of the benefit of its bargain, if we held that defendant could, without liability, voluntarily place itself in a situation which precludes it from accepting any orders placed during the 60-day plus 6-month period. (See *Langenberg* v. *Guy, supra*; Annot., Effect of Attempt to Terminate Employment or Agency Contract Upon Shorter Notice Than That Stipulated in Contract (1964) 96 A.L.R.2d 272, 279-280; Annot., Duty of Principal to Fill Orders Under Sales-agency Contract (1928) 52 A.L.R. 557; see also *Gaspar* v. *United Milk Prod. of Cal.*, 62 Cal.App.2d 546, 550-553 [144 P.2d 867]; *Martin* v. *Star Publishing Company* (1956) 50 Del. 181 [126 A.2d 238, 243]; *Baumer* v. *Franklin County Distilling Co.* (6th Cir. 1943) 135 F.2d 384, 388; *In re Elliott Wholesale Grocery Co.* (S.D.Cal. 1951) 98 F.Supp. 1017, 1018; 56 C.J.S., Master and Servant, § 34, pp. 420-421; 53 Am.Jur.2d, Master and Servant, § 41, p. 116.)

The cases cited by defendant do not support relieving defendant of this obligation. In *San Francisco Realty Co.* v. *Linnard*, 98 Cal.App. 33 [276 P. 368], the defendant employed the plaintiff to be his exclusive insurance broker for all insurance to be carried by defendant in connection with a hotel, for a term of five years. When, after about seven months, the hotel was conveyed to another party and defendant

surrendered his lease, the plaintiff sought damages for defendant's failure to place insurance on the hotel for the balance of the five-year term. The court rejected the plaintiff's position, pointing to evidence that the parties were originally aware that the defendant's relationship with the hotel, and his desire for insurance, might change. (*Id.,* at p. 39.) In a sense, the plaintiff in *Linnard* had voluntarily assumed a business risk that the defendant's need for insurance might not continue throughout the five-year term.

In *Langenberg* v. *Guy, supra,* the court found the general rule of liability to be inapplicable in the particular circumstances of that case. There the defendant had hired the plaintiff to haul lumber for a period of one year " '*as our business warrants.*' " (77 Cal.App. at p. 666; italics in original.) The court found the inclusion of the phrase "as our business warrants" to be determinative in showing that the parties contemplated the possibility that business might be reduced, even to the vanishing point, before one year expired. (*Id.,* at pp. 667-670.)

Defendant attempts to analogize this case to *Langenberg* by pointing to paragraph 4 of the contract, which gave defendant "absolute right to refuse acceptance of orders." However, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) The termination clause was specific as to providing plaintiff with the benefit of certain orders placed after plaintiff's termination. To say that the defendant could arbitrarily refuse to accept any such orders would render nugatory the termination provision.[10]

Thus the fact that defendant did not accept any orders placed during the 60-day plus 6-month period because it sold the business, does not relieve defendant of its obligations under the contract. Plaintiff should be entitled to the benefit of its bargain, i.e., commissions on all orders which would have been placed within 60 days plus 6 months of the notice of termination and accepted by defendant, if defendant had not sold its business.

---

[10]The fact that the term "orders placed" was specifically defined in the agreement to mean orders as dated by the customer, regardless of when accepted by defendant, is further evidence the parties did not intend defendant to be able to exercise its right to refuse acceptance in a manner which would defeat plaintiff's rights under the termination clause.

The judgment is reversed and the cause remanded for a determination of plaintiff's damages in a manner consistent with the views expressed in this opinion.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 9, 1977.